1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10

11   JAMES LAGARDE, et al.,                    Case No.: 12-0609 (JSC)

12              Plaintiffs,                    **ORDER GRANTING PRELIMINARY
                                               APPROVAL OF CLASS ACTION
13        v.                                   SETTLEMENT
                                               (Dkt. Nos. 42, 47-1)**
14
15   SUPPORT.COM, INC., et al.,
16              Defendants.
17

18        In this pre-certification class action dispute, Plaintiffs allege Defendants induced the purchase

19   of two computer performance products through misrepresentations about the status of potential

20   customers' computers and the utility of the products. Now pending before the Court is Plaintiffs'

21   motion for preliminary approval of a class action settlement. (Dkt. Nos. 42, 44, 47-1.) After reviewing

22   the proposed settlement, along with the supplemental documentation and addendum submitted on

23   October 19, 2012 (Dkt. No. 47), and with the benefit of oral argument on September 27, 2012, the

24   Court GRANTS Plaintiffs' motion as outlined below.

25                              **BACKGROUND**

26        On February 7, 2012, Plaintiff James LaGarde initiated this action against Defendants after

27   purchasing Defendants' Advanced Registry Optimizer ("ARO") software. (Dkt. No. 1.) Plaintiff Tim

28   Batchelor, who purchased AOL Computer Checkup ("Checkup") software, joined the case on August

*United States District Court*
*Northern District of California*

6, 2012 through the Second Amended Complaint. (Dkt. No. 39.) Batchelor initially brought suit in the Southern District of New York (No. 1:12-cv-00963-JSR) "against AOL and a now dissolved subsidiary of Support.com related to the alleged deceptive design and marketing of the Computer Checkup software" but voluntarily dismissed that pending action because "a great deal of the evidence relevant to his claims was in [Defendants'] possession in San Francisco." (Dkt. No. 42 at 10-11.)

Plaintiffs bring three causes of action against Defendants in the Second Amended Complaint: 1) fraudulent inducement, 2) breach of express warranties, and 3) breach of contract. (Dkt. No. 39 ¶¶ 51-65.) Plaintiffs allege that Defendants' inaccurate statements about the ability of ARO and Checkup to enhance the speed, performance, and stability of personal computers induced customers to purchase these products at a price inflated by Defendants' false claims of value. (*Id.* ¶¶ 1-2, 5.) According to Plaintiffs, Defendants 1) provided potential customers with a free diagnostic scan designed "to misrepresent and exaggerate the existence and severity of detected errors, as well as the overall status of the PC" and 2) misled all customers, even those who did not use the free scan prior to purchase, about the services actually provided by ARO and Checkup. (*Id.*¶¶ 1-5.)  Some customers, like LaGarde, "purchased and continued to use" ARO for approximately $29 based on misrepresentations about "the purported low health and security status of their computer." (Dkt. No. 42 at 9.) Others, like Batchelor, paid approximately $4.99 per month for a subscription to Checkup "as a result of [their] reliance upon Defendants' representations about the functionality of that software and in-software representations about the condition of [their] computer[s]." (*Id.*)

## SETTLEMENT PROPOSAL

On June 18, 2012, the parties met for a private mediation session with Randall Wulff after exchanging "information through formal and informal discovery requests" and considering Plaintiffs' "expert's conclusions about the software." (Dkt. No. 42 at 11.) Though "Defendants have denied and continue to deny any wrongdoing," the parties reached a settlement. (*Id.*)

### A.  Provisions

The settlement provides for 1) improvements to ARO and Checkup and their representations of functionality; 2) monetary relief for class members through a non-segregated $8,595,000 settlement fund to pay claims to class members in the amount of $10 each, notice and administration

expenses up to $100,000, a $5,000 collective incentive award to LaGarde and Batchelor, and attorneys' fees and reimbursement expenses up to $900,000 for this action and the previous Batchelor matter; and 3) three months of free access to Defendants' anti-spyware software for each class member. The parties also agreed that half of the refunds Defendants have paid to purchasers of ARO and Checkup prior to the Claims Deadline will be applied against the Settlement Fund. (Dkt. No. 47-1 at 2.)

With respect to the injunctive relief, Defendants will modify the source codes of both ARO and Checkup to provide future consumers with more accurate information about the diagnostic scans employed by the products. In addition, Defendants will create documentation for both products that explains key terms generated by the products "in layman's terms" and describes "the actual risk to [consumers'] computers posed by the errors and other problems detected by the software that informed such reports." (Dkt. No. 42 at 12-14.)

**B. Proposed Class**

In his motion for class certification, Plaintiff LaGarde proposed the following class definition: "All individuals and entities in the United States and its territories who have paid a fee to purchase Support.com, Inc.'s Advanced Registry Optimizer software." (Dkt. No. 4 at 5.) After amending the complaint to include Plaintiff Batchelor, Plaintiffs added Computer Checkup software to this definition. (Second Amended Complaint ¶ 43.) For settlement purposes, the parties propose a slightly modified definition: "All individuals and entities in the United States and its territories that have paid monies for any version of Defendants' Advanced Registry Optimizer and/or Computer Checkup software at any time until the date of this Preliminary Approval Order." (Dkt. No. 42-1 at 40.) Computer Checkup was first offered for sale in September 2011; sales of ARO began in December 2009. Defendants continue to offer both products for sale. (Dkt. No. 47-1 ¶ 10.) There are approximately 759,000 class members.

**DISCUSSION**

A class action settlement must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). When, as here, parties reach an agreement before class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton*

*v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). If the Court temporarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified and a final "fairness" hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23. *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 3542187 *4 (N.D. Cal. Aug. 14, 2012).

### A. CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS

Class actions must meet the following requirements prior to certification:

1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)--of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Prior to certifying the class, the Court must determine that Plaintiffs have satisfied their burden to demonstrate that the proposed class satisfies each element of Rule 23.

1. Rule 23(a)

   **a. Numerosity**

4

1    There is no exact class size that meets the numerosity requirement; rather, "[w]here the exact

2  size of the class is unknown but general knowledge and common sense indicate that it is large, the

3  numerosity requirement is satisfied," particularly where  the proposed "class is geographically

4  dispersed" with "difficult to identify" members. *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D.

5  346, 350-351 (N.D. Cal. 2005)(internal quotations and citation omitted). Numerosity is satisfied here.

6  (Dkt. No. 47-1 ¶ 10.)

7                     **b.  Commonality**

8    The commonality requirement is "construed permissively," and "[a]ll questions of fact and

9  law need not be in common." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). In fact,

10  both "divergent factual predicates" with "shared legal issues" and "a common core of salient facts

11  coupled with disparate legal remedies within the class" can be sufficient. *Graham v. Overland*

12  *Solutions, Inc.*, 2012 WL 4009547 *2 (S.D. Cal. Sept. 12, 2012)(quoting *Hanlon v. Chrysler Corp.,*

13  150 F.3d 1011, 1019 (9th Cir.1998)).

14    In this case, the common questions of law and fact center around whether the marketing for

15  ARO and Checkup misrepresented both abilities to enhance computer performance and problems

16  encountered on customers' computers. (Dkt. No. 42 at 16.) Each individual user might have been

17  affected slightly differently (i.e., those who used the diagnostic scan prior to purchase versus those

18  who did not; those who subscribed monthly to Checkup versus those who paid a fixed sum for ARO;

19  and those who interacted with the products heavily versus those who were passive consumers with

20  less reliance on the products' assessments). Potentially different expectations between class members

21  who relied more or less on Defendants' alleged misrepresentations cannot easily be quantified,

22  however, and there are no allegations that Defendants' products actively harmed users' computers.

23  Thus, the harm each class member suffered is best represented by money spent on an allegedly

24  underperforming product.

25    These expenditures are roughly even: Checkup users spent approximately $5 per month for an

26  average of four to five months while ARO users paid a one-time fee of around $30. In addition, the

27  claims available to each Checkup and ARO user arise from the same source since the software, user

28  agreements, advertisements, and other materials generated by Defendants for ARO and Checkup were

United States District Court
Northern District of California

5

not customized for individual users. *See, e.g., Hanlon*, 150 F.3d at 1019-1020 (stating that the commonality requirement was met where proposed class members had "different avenues of redress" but "their claims stem from the same source"). Consequently, the software deficits and product misrepresentations alleged by Plaintiffs all succeed or fail together, and the commonality requirement is met.

### c. Typicality

Typicality is similar to commonality, and the two "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). The typicality requirement is meant "to assure that the interest of the named representative aligns with the interests of the class" and is satisfied when class members "have the same or similar injury, . . . the action is based on conduct which is not unique to the named plaintiffs, and . . . other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)(internal quotation marks and citations omitted). The injuries of the named plaintiffs and other class members need not be identical as long as they are similar and from the same disputed conduct. *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 635 (C.D. Cal. 2009). Plaintiffs allege that here all proposed class members "were damaged in a nearly identical manner" when "Defendants misrepresented the utility of the ARO and Computer Checkup software to them, intentionally designed the software to misrepresent the actual condition of their computers, and induced them to purchase a full version of the software despite having full knowledge that it does not possess the utility represented by Defendants." (Dkt. No. 42 at 17.) Since Plaintiffs' claims are sufficiently typical of the proposed class, this element is satisfied.

### d. Adequacy of Representation

Adequacy of representation is determined by answering two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Conflict of interest inquiry "is especially critical when the class settlement is tendered along with a motion for class certification." *Id.* "Representatives must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997). In addition, "a class

United States District Court
Northern District of California

1  representative must not be antagonistic or have conflicts of interest with other potential class

2  members." *Andrews Farms v. Calcot, LTD.*, 2010 WL 3341963 *4 (E.D. Cal. Aug. 23, 2010). A

3  named plaintiff must otherwise meet a fairly low threshold to properly represent the class: "[t]he fact

4  that plaintiffs are familiar with the basis for the suit and their responsibilities as lead plaintiffs is

5  sufficient to establish their adequacy." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 267 (N.D. Cal.

6  2011). With regard to vigorous representation, "a key consideration is the competency of counsel"

7  and whether "the named plaintiffs have participated in the litigation process." *Campbell v.

8  PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 596 (E.D. Cal. 2008). In addition, "class counsel

9  must be qualified, experienced, and generally able to conduct the class action litigation." *Andrews

10  Farms v. Calcot, LTD.*, 2010 WL 3341963 *4 (E.D. Cal. Aug. 23, 2010).

11      Here, information is not provided as to the involvement of the named Plaintiffs with the

12  litigation. Plaintiff LaGarde used ARO, Plaintiff Batchelor used Checkup, and both experienced the

13  same injuries as other class members. Nothing about the facts or genre of this case suggests any

14  antagonism or conflicting interests between the named Plaintiffs and the potential class members. In

15  addition, Edelson McGuire LLC has represented numerous class actions in the technology field, and

16  this district has previously found the firm "experienced and knowledgeable" in this type of litigation.

17  *In re Netflix Privacy Litig.*, 2012 WL 2598819 *4 (N.D. Cal. July 5, 2012).  The Court finds this case

18  has adequate representation.

19      As outlined above, Plaintiffs have satisfied the requirements of Rule 23(a).

20          2.  Rule 23(b)

21      To certify their class, Plaintiffs must meet "each of the four requirements of Rule 23(a) and at

22  least one of the requirements of Rule 23(b)." *Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718,

23  724 (9th Cir. 2007). Here, Plaintiffs argue the applicability of 23(b)(3), which requires establishing

24  "the predominance of common questions of law or fact and the superiority of a class action relative to

25  'other available methods for the fair and efficient adjudication of the controversy.'" *In re Napster, Inc.

26  Copyright Litig.*, 2005 WL 1287611 *6 (N.D. Cal. June 1, 2005)(quoting Fed.R.Civ.P. 23(b)(3)).

27          **a.  Predominance**

28

7

Rule 23(b)(3) first requires "a predominance of common questions over individual ones" such that "the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). This "inquiry focuses on the relationship between the common and individual issues." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)(internal citation and quotation marks omitted). In particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997).

Here, Plaintiffs maintain that no proposed class member could prevail against Defendants without proving that they "intentionally designed the ARO and Computer Checkup software to misreport and exaggerate the existence of errors" and the corresponding marketing materials "to misrepresent the actual capabilities of the software." (Dkt. No. 42 at 19.) As discussed above, each class member may have been personally affected in a slightly different manner, but the "common questions" about the software design and advertising overshadow individual differences. As such, the Court finds that common questions of law and fact predominate.

**b. Superiority**

A class action is a superior means of adjudicating a dispute "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). In evaluating superiority, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007) *modified,* 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007) *aff'd sub nom. Hunt v. Imperial Merch. Services, Inc.*, 560 F.3d 1137 (9th Cir. 2009). Plaintiffs note that in addition to the inefficient duplication of litigation required absent a class action, "there is no indication that members of the Settlement Class have a strong interest in individual litigation or an incentive to pursue their claims individually, given the small amount of damages likely to be recovered relative to the resources required to prosecute such an action." (Dkt. No. 42 at 20); *see, e.g., Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010)(evaluating superiority under Rule 23(b)(3) and noting that "the class action is superior to

United States District Court
Northern District of California

1    maintaining individual claims for a small amount of damages"). The Court finds that a class action is

2    superior to other forms of litigation in this action.

3          After reviewing the above requirements pursuant to Rule 23, the Court finds that conditional

4    class certification for settlement purposes is proper.

5          **B.  CLASS COUNSEL**

6           "[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In

7    considering this appointment, a court must consider:

8          (i)    the work counsel has done in identifying or investigating potential claims in
                  the action;
9          (ii)   counsel's experience in handling class actions, other complex litigation, and the
10                types of claims asserted in the action;
11         (iii)  counsel's knowledge of the applicable law; and
           (iv)   the resources that counsel will commit to representing the class.

12   Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs' counsel claims to have "diligently investigated, prosecuted,

13   and dedicated substantial resources to the investigation of claims at issue in this case." (Dkt. No. 42 at

14   21.) As noted above, this District has previously recognized Plaintiffs' counsel as experienced and

15   able in representing similar class actions involving a large number of class members in a technology-

16   related dispute.

17         To consider the vigor with which proposed class counsel would pursue litigation,

18   "considerations include competency of counsel and, in the context of a settlement-only class, an

19   assessment of the rationale for not pursuing further litigation." *Hanlon v. Chrysler Corp.*, 150 F.3d

20   1011, 1021 (9th Cir. 1998). Counsel contends that the settlement decision is the result of "the

21   litigation that has occurred, the formal and informal discovery conducted in the two cases, several

22   months of arm's-length negotiations, and their experience with the utility software industry more

23   generally." (Dkt. No. 42 at 21.)  The Court finds that counsel has the requisite experience, knowledge,

24   qualifications, and resources to represent the class members in this action and that the reasons for

25   pursuing settlement at this stage in the litigation do not call into question their representation of absent

26   class members. Plaintiff's counsel is thus appointed to serve as Class Counsel for the purposes of this

27   settlement.

28

United States District Court
Northern District of California

### C. PRELIMINARY APPROVAL OF THE SETTLEMENT

Rule 23(e) is designed "to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1100 (9th Cir. 2008). The approval of a settlement that "takes place prior to formal class certification requires a higher standard of fairness" because "[t]he dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

#### 1. Fairness Factors

The fairness of a proposed settlement involves the weighing of the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)(quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). However, when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone is" insufficient. *Id.* In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties. *Id.* at 947.

The Court cannot fully assess all of these fairness factors until after the final approval hearing; thus, "a full fairness analysis is unnecessary at this stage." *Alberto v. GMRI, Inc.,* 252 F.R.D. 652, 665 (E.D. Cal. 2008)(internal quotation marks and citation omitted). Instead, "the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007). At this juncture, "preliminary approval of a settlement and notice to the proposed class is appropriate: if '(1) the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, (2) has no obvious deficiencies, (3) does

1    not improperly grant preferential treatment to class representatives or segments of the class, and (4)

2    falls with [sic] the range of possible approval.'" *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL

3    3542187 *4 (N.D. Cal. Aug. 14, 2012)(quoting *In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078,

4    1079 (N.D. Cal. 2007)).

### a.    The Proposed Settlement

6        This first factor concerns "the means by which the parties arrived at settlement." *Harris v.*

7    *Vector Mktg. Corp.*, 2011 WL 1627973 *8 (N.D. Cal. Apr. 29, 2011). For the parties "to have

8    brokered a fair settlement, they must have been armed with sufficient information about the case to

9    have been able to reasonably assess its strengths and value." *Acosta v. Trans Union, LLC*, 243 F.R.D.

10   377, 396 (C.D. Cal. 2007). Particularly with pre-certification settlements, enough information must

11   exist for the court to assess "the strengths and weaknesses of the parties' claims and defenses,

12   determine the appropriate membership of the class, and consider how class members will benefit from

13   settlement" in order to determine if it is fair and adequate. *Id.* at 397 (internal quotation marks and

14   citation omitted). Because "collusion may not always be evident on the face of a settlement," the

15   settlement must be examined "not only for explicit collusion, but also for more subtle signs that class

16   counsel have allowed pursuit of their own self-interests and that of certain class members to infect the

17   negotiations." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 947.

18       The Court is satisfied that the means by which the parties investigated the claims and reached

19   settlement were sufficient. The use of a mediator and the presence of discovery "support the

20   conclusion that the Plaintiff was appropriately informed in negotiating a settlement." *Villegas v. J.P.*

21   *Morgan Chase & Co.*, 2012 WL 3542187 *5 (N.D. Cal. Aug. 14, 2012); *Harris v. Vector Mktg.*

22   *Corp.*, 2011 WL 1627973 *8 (N.D. Cal. Apr. 29, 2011)(noting that the parties' use of a mediator

23   "further suggests that the parties reached the settlement in a procedurally sound manner and that it

24   was not the result of collusion or bad faith by the parties or counsel"). However, the use of a neutral

25   mediator "is not on its own dispositive of whether the end product is a fair, adequate, and reasonable

26   settlement agreement." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 948. Plaintiffs note

27   that "despite their many previous discussions regarding potential resolution, the parties were only able

28   to reach a settlement with the assistance of a professional third-party neutral—Randall Wulff"—and

United States District Court
Northern District of California

11

significant factual inquiry into the merits of the case through an expert and "additional information related to the scope of the Settlement Class and the nature of the Software Products at issue" provided by Defendants. (Dkt. No. 42 at 22.)

The parties therefore had sufficient information to accurately estimate and negotiate a fair settlement award, including input from expert examination of the products in question. Since a record exists of those who purchased the two disputed products, the parties could gauge the size of the class and estimate potential liability and litigation costs. Further, since the allegations do not include harm to class members' computers, monetary damages have a uniform ceiling in the amount paid to purchase ARO or Checkup. Plaintiffs contend that "based upon proposed Class Counsel's own investigation and the information obtained from Defendants, the $8.595 million monetary component of the settlement represents close to a full monetary recovery for the Settlement Class." (Dkt. No. 42 at 23.)

The Court is satisfied that there is no evidence of collusion among the parties and that the process through which the parties arrived at this settlement was sound.

### b.  Obvious Deficiencies

The Court next considers "whether there are obvious deficiencies in the Settlement Agreement." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973 *8 (N.D. Cal. Apr. 29, 2011). During the hearing held on September 27, 2012, the Court addressed the following concerns with the parties: the inability to calculate the true value of the proposed settlement given the refund credit and reversionary provisions attached to the $8.595 million fund, the lack of clarity regarding the number of class members and anticipated response rates, and the value ascribed to the three-month antispyware subscription; the issue of fairness between the class members who purchased ARO for approximately $30 and those who purchased Checkup for approximately $5; the monitoring mechanism to enforce the injunctive relief; and the release language. (Dkt. No. 46.)

In response to the concerns expressed by the Court at the hearing, Plaintiffs submitted an addendum to the proposed settlement agreement as well as the additional information the Court requested. (Dkt. No. 47.)  The record now reflects that the class size is approximately 759,000 and, as of October 19, 2012, Defendants had paid $245,000 in refunds, $122,500 of which would be deducted

from the $8,595,000 settlement fund. (Dkt. No. 47-1 at 2.) Thus, the refund amount is minimal given the overall size of the fund and the number of class members such that the remaining funds should be more than sufficient to fully satisfy each claim made.

The parties represent that the three months of antispyware software is valued at $7.50, and class members will have access to the spyware through an activation code with no need to provide a credit card number or to cancel the service after the free three months expire. This information alleviates the Court's concern about whether class members would need to either provide personal information that could be used for marketing or affirmatively cancel the subscription after the three months to avoid additional charges.

With respect to enforcement of the injunctive relief, a new provision has been added to the settlement agreement that governs enforcement such that "any non-breaching party shall be entitled to bring an action seeking to enforce" and can recover attorneys' fees if successful. (Dkt. No. 47-1 at 3.) This addition satisfies the Court's question about how the injunctive relief could be enforced.

Finally, the release has been "narrowed to capture only the claims and allegations at issue in the case." (Dkt. No. 47-1 at 1.) The language now only releases claims based on "the design, use, functionality, operation, and/or performance of the Software Products," which the Court construes to release only claims based on the allegations in this lawsuit. (Dkt. No. 47-1 at 2-3.) This change satisfies the Court's issue with the previous release language, which potentially precluded future claims against Defendants that exceeded the scope of this suit, from a destructive virus spread by Defendants' software to double billing a customer for the products. (Dkt. No. 46 at 30-31.)

Thus, the only remaining potential deficiency is a lack of clarity about how much Defendants will actually pay pursuant to this settlement agreement. Regardless of the final value, however, each individual class member will be entitled to $10 and antispyware software worth $7.50 as compensation for paying $5-$30 for software that, based on Plaintiffs' allegations, arguably provided some utility, though not as fully as advertised. The full value of the settlement actually paid, or at least its approximate full value, will be known before the Court finally considers and approves the settlement, attorneys' fees and incentive awards for the named plaintiffs. As such, the ambiguity at this stage of approval is not a fatal deficiency.

United States District Court
Northern District of California

1    After reviewing the additional information submitted by Plaintiffs, the Court finds that

2    obvious deficiencies in the proposed settlement have been adequately addressed.

3                          **c.   Preferential Treatment**

4    Under this factor, "the Court examines whether the Settlement provides preferential treatment

5    to any class member." *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 3542187 *6 (N.D. Cal. Aug.

6    14, 2012). Each proposed class member in this case may claim $10 and three months of free

7    antispyware service with the exception of named Plaintiffs LaGarde and Batchelor, who each petition

8    to receive an incentive award of $2,500. "Incentive *awards* [as opposed to agreements] are fairly

9    typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). There

10   is no evidence that named Plaintiffs and counsel agreed prior to the suit to a particular incentive

11   agreement. Though viewed more favorably than incentive agreements, "excess incentive awards may

12   put the class representative in a conflict with the class and present a considerable danger of

13   individuals bringing cases as class actions principally to increase their own leverage to attain a

14   remunerative settlement for themselves and then trading on that leverage in the course of

15   negotiations." *Id.* at 960 (internal quotation marks and citation omitted). Incentive awards

16   "compensate class representatives for work done on behalf of the class, to make up for financial or

17   reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to

18   act as a private attorney general." *Id.* at 958-59.

19   A class representative must justify an incentive award through "evidence demonstrating the

20   quality of plaintiff's representative service," such as "substantial efforts taken as class representative

21   to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI,*

22   *Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008); *Lemus v. H & R Block Enterprises LLC.*, 2012 WL

23   3638550 *6 (N.D. Cal. Aug. 22, 2012)(finding incentive payments to the named plaintiffs proper after

24   receipt of declarations from the named plaintiffs outlining their involvement in the litigation justifying

25   their awards).

26   No declarations have been provided about the efforts either named plaintiff contributed to this

27   action. Without more information, the Court cannot determine whether the incentive payments are

28   fair. However, these payments represent only $5,000 of a settlement fund worth over $8 million, and

there are no other indications of significant preferential treatment among the class members. Since the Court can fully consider whether these payments are reasonable in light of further information provided by Plaintiffs prior to the final fairness hearing, this information is not crucial for preliminary approval, especially since the amount requested is not unreasonable on its face. *See Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008)(stating courts generally find that even "$5,000 incentive payments [for each named plaintiff] are reasonable").

At the September 27, 2012 hearing, the Court also questioned whether Checkup class members were being treated preferentially over ARO customers since all class members would receive a $10 settlement even though Checkup customers might have paid only $5 for one month of Checkup while ARO customers spent approximately $30 to buy that program, or, conversely, long-time Checkup customers might have paid as much as $60 for 12 months of service. The Court is satisfied that the settlement is fair given the parties' representation that the average Checkup customer spent between $20-$25 for four to five months of Checkup service, an amount similar to the ARO customers. (Dkt. No. 47-1 at 2.)

The proposed settlement passes scrutiny for preferential treatment among class members.

### d.  Range of Possible Approval

To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F.Supp.2d at 1080. Here, the class size is 759,000. Each class member spent at least $5 and up to $60 for one month to one year of Checkup or approximately $30 to purchase ARO. Since customers arguably received some value from the products, even if they did not perform as fully as advertised, a $10 settlement and access to three months of anti-spyware protection worth approximately $7.50 is a fair outcome. If the case were to continue, the outcome is uncertain. Defendants, even now, contest all wrongdoing and continue to sell both products. While Plaintiffs assert that their expert and preliminary discovery support their allegations, continued discovery will escalate the costs of this action and delay resolution. The Court considers that even if "Plaintiffs were to prevail, they would be required to expend considerable additional time and resources potentially outweighing any additional recovery

1    obtained through successful litigation," and these delays will affect "payment to the Class Members

2    and increase the amount of attorneys' fees." *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294,

3    302 (E.D. Cal. 2011).

4          In addition, this settlement includes injunctive relief in the form of modified source code and

5    new documentation that will provide future consumers with better information about Defendants'

6    products and avoid, or at least mitigate, confusion about their functionality and capabilities. This

7    outcome provides intangible value to future users of ARO and Checkup and contributes to the overall

8    adequacy of the settlement.

9          In consideration of these factors, the Court makes a preliminary finding that the proposed

10   settlement, in light of the clarifications provided by the parties and modifications to the settlement, is

11   fair, adequate and reasonable and in the best interests of the class members given the uncertainty of

12   continued litigation.

13         2.  Notice

14         For any class certified under Rule 23(b)(3), class members must be afforded the best notice

15   practicable under the circumstances, which includes "individual notice to all members who can be

16   identified through reasonable effort. The notice must clearly and concisely state in plain, easily

17   understood language:

18              **(i)**    the nature of the action;
               **(ii)**   the definition of the class certified;

19              **(iii)**  the class claims, issues, or defenses;
               **(iv)**   that a class member may enter an appearance through an attorney if the member so

20                         desires;

21              **(v)**    that the court will exclude from the class any member who requests exclusion;
               **(vi)**   the time and manner for requesting exclusion; and

22              **(vii)**  the binding effect of a class judgment on members under Rule 23(c)(3)."

23   Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the settlement

24   in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

25   heard." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation

26   marks and citation omitted). After review of the proposed notice to class members, the Court finds the

27   information provided meets the requirements of Rule 23(c)(2)(b) and next examines the proposed

28   manner of providing class members with this notice.

16

United States District Court
Northern District of California

1       A two-part notice plan is proposed. Each member of the proposed class will receive a direct e-

2   mail to their last-known e-mail address. In addition, "the Claims Administrator will establish a

3   website, which will allow uninterrupted access by the public to relevant Court documents,

4   downloadable Claim Forms, as well as provide for the online submission of claims." (Dkt. No. 42 at

5   24-25.) The parties propose that all claim forms be received within 90 days "after the Settlement Class

6   Notice is first disseminated to the Settlement Class." (Dkt. No. 42-1 at 5.)

7       At the September 27, 2012 hearing, the Court sought clarity on the notice process, including

8   the proposed subject heading for emails to class members, the response to emails that "bounce back"

9   or are otherwise undeliverable, the requested information on the claim form, and the manner in which

10   the electronic submission process would function. (Dkt. No. 46.) In response, Plaintiffs submitted a

11   simplified claims form, which requires class members to provide less information to benefit from the

12   settlement. (Dkt. No. 47-1 at 13-14.) Plaintiffs also provide a declaration from a Project Manager at

13   Epiq Systems, a company retained to "implement and oversee the Notice Plan." (Dkt. No. 47-2 ¶ 2.)

14   This declaration outlines a plan to utilize a "multi-faced process to ensure that the Notice reaches the

15   greatest number of Settlement Class members possible, while avoiding spam filters and other

16   potential barriers to delivery of the Notice." (*Id.* ¶4.)

17       The Court finds that the proposed notice informs class members of sufficient settlement details

18   to enable those with an adverse interest to come forward. In addition, the online claims submission

19   process, as clarified at the hearing and through the Eqiq declaration, is the best practicable notice

20   under the circumstances, particularly here where each class member purchased ARO or Checkup

21   online and therefore has an email address.

22                                              **CONCLUSION**

23       The Court preliminarily finds that the proposed class meets the requisite certification standards

24   and GRANTS conditional certification of the class for settlement purposes. The proffered settlement

25   agreement, as modified after the hearing, meets the requisite requirements for fair, adequate, and

26   reasonable settlement at this juncture of the settlement process. For the reasons stated above, the

27   Court therefore GRANTS the motions for preliminary approval of the class action settlement,

28

17

appointment of Edelson McGuire LLC as Class Counsel and Plaintiffs LaGarde and Batchelor as
class representatives for settlement purposes, and the form and content of the proposed notice.

This matter will be heard for a final fairness hearing on **March 7, 2013** at 9 am. Plaintiffs'
applications for attorneys' fees and incentive awards will be reviewed at that time. Any final
submissions the parties wish the Court to review prior to this hearing shall be submitted on or before
February 21, 2012.

**IT IS SO ORDERED.**

Dated:  November 2, 2012

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

United States District Court
Northern District of California

18