1  JAY EDELSON (Admitted *Pro Hac Vice*)
   jedelson@edelson.com
2  RAFEY S. BALABANIAN (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
3  BENJAMIN H. RICHMAN (Admitted *Pro Hac Vice*)
   brichman@edelson.com
4  CHANDLER R. GIVENS (Admitted *Pro Hac Vice*)
   cgivens@edelson.com
5  EDELSON MCGUIRE LLC
   350 North LaSalle Street, Suite 1300
6  Chicago, Illinois 60654
   Telephone: (312) 589-6370
7  Facsimile: (312) 589-6378

8  SEAN P. REIS (SBN 184044)
   sreis@edelson.com
9  EDELSON MCGUIRE LLP
   30021 Tomas Street, Suite 300
10 Rancho Santa Margarita, California 92688
   Telephone: (949) 459-2124
11 Facsimile: (949) 459-2123

12 *Attorneys for Plaintiffs and the Putative Class*

13            **UNITED STATES DISTRICT COURT**

14       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15              **SAN FRANCISCO DIVISION**

16 | JAMES LAGARDE and TIM BATCHELOR, | Case No. 3:12-cv-00609-JSC |
   individually and on behalf of all others
17 similarly situated, | **PLAINTIFFS' MOTION FOR AND** |
                        | **MEMORANDUM IN SUPPORT OF** |
18         *Plaintiffs*, | **FINAL APPROVAL OF CLASS** |
                         | **ACTION SETTLEMENT** |
19     v. |
           | Date: March 7, 2013 |
20 SUPPORT.COM, INC. d/b/a SAMMSOFT, a | Time: 9:00 a.m. |
   Delaware corporation, and AOL, INC., a | Location: Courtroom F, 15th Floor |
21 Delaware corporation, | Judge: Honorable Jacqueline Scott Corley |

22         *Defendants*. | Action Filed: February 7, 2012 |

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

   **PLEASE TAKE NOTICE** that on March 7, 2013 at 9:00 a.m., or as soon thereafter as counsel may heard, Plaintiffs James LaGarde and Tim Batchelor will appear for a final Fairness Hearing, through counsel, before the Honorable Jacqueline Scott Corley, or any judge sitting in her stead, in Courtroom F, 15th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, and then and there move the Court for an Order (i) granting final approval of the parties' class action settlement, (ii) dismissing Plaintiffs' Second Amended Complaint with prejudice and releasing any and all Released Claims as provided in the Parties' Stipulation of Class Action Settlement, and (iii) granting such other and further relief as the Court deems reasonable and just.

   Plaintiffs' Motion is based on this Notice of Motion, the authorities cited in the attached Memorandum in Support, oral argument of counsel, all of the documents in the record in this matter, and any other matter that may be submitted or raised at the Fairness Hearing on the Motion.

Respectfully Submitted,

**JAMES LAGARDE and TIM BATCHELOR,**
individually and on behalf of all others similarly situated,

Dated: February 21, 2013          By: /s/ Rafey S. Balabanian
                                        One of Plaintiffs' Attorneys

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (*Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (*Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (*Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 3

     A.     Plaintiffs' Allegations Regarding Defendants' Design and
         Marketing of the Software Products ........................................................ 3

     B.     Plaintiffs' Expert Confirms that the Software Products do not
         Function as Advertised ............................................................................4

     C.     The Litigation, Negotiations, and Settlement ......................................... 4

     D.     Preliminary Approval of the Proposed Settlement ................................. 5

     E.     Defendants' Defenses and Denials ......................................................... 6

III.    TERMS OF THE SETTLEMENT ....................................................................... 7

     A.     Class Definition ...................................................................................... 7

     B.     Prospective Relief ................................................................................... 7

          1.    *Improvements to the Software Products* ..................................... 7

          2.    *New Documentation Explaining the Software's Functionality* ............... 7

     C.     Monetary Relief ...................................................................................... 8

     D.     Other Relief ............................................................................................. 8

          1.    *Anti-Spyware Software* .............................................................. 8

          2.    *Payment of Notice and Administrative Expenses* ..................... 8

          3.    *Compensation for the Class Representatives* ........................... 8

          4.    *Payment of Attorneys' Fees and Expenses* .............................. 9

     E.     Release .................................................................................................... 9

IV.     NOTICE WAS PROVIDED TO THE CLASS AND
      DUE PROCESS SATISFIED ............................................................................. 9

V.      THE SETTLEMENT WARRANTS FINAL APPROVAL ................................. 10

     A.     The Strength of Plaintiffs' Case Compared to the Relief Afforded by the
         Settlement and the Risks of Continued Litigation .......................... 12

     B.     The Risk of Maintaining Class Action Status ...................................... 15

     C.     The Amount Offered in Settlement ...................................................... 16

D.      The Extent of Discovery and Stage of Litigation ...............................17

E.      The Experience and Views of Counsel ..............................................17

F.      The Presence of a Governmental Participant ...................................18

G.      The Reaction of Settlement Class Members ....................................19

H.      The Absence of Collusion in Reaching the Settlement Precludes
        Additional Scrutiny and Favors Final Approval ..............................19

VI.     CONCLUSION ................................................................................................21

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases**:

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)..........................................................................9

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968)................................12

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...................................................15

**United States Circuit Court of Appeals Cases**:

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)..........................................11, 19

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .....................................11

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .............................................. 11, 16, 19

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)..................................20-21

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)........................................ 12, 17, 19

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ...............................................17

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998)........................................17

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*,
    688 F.2d 615 (9th Cir. 1982)...............................................................11-12, 15-16

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ............................... 11-12, 16, 18

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)................................................................20

**United States District Court Cases**:

*Batchelor v. AOL, Inc. et al.*, No. 1:12-cv-00963-JSR (S.D.N.Y.) ...................................... 4

*Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB,
    2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) ...........................................17

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) .......................................... 18

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC,
    2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)..............................................11-12, 18-19

*Gardner v. GC Servs., LP*, No. 10-CV-0997-IEG CAB,
    2012 WL 111953 (S.D. Cal. Apr. 2, 2012)..............................................15, 17

*In re AT & T Mobility Wireless Data Serv. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010)............ 19

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX,
    2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ...........................................21

*In re Omnivision*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)................................... 12, 17-18

*In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985)...........................................17

*Ledet v. Ascentive LLC*, No. 2:11-CV-295-PBT (E.D. Pa. Jan. 18, 2011)...................... 1 n.2, 2, 14

*Martin v. Ameripride Serv., Inc.*, No. 08-cv-440-MMA (JMA),
    2011 WL 2313604 (S.D. Cal. June 9, 2011) ................................................................. 18-20

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004).......... 12, 17-19

*Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484,
    2007 WL 3492841 (E.D. Cal. Nov. 14, 2007)................................................................11

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC,
    2012 WL 5392159 (S.D. Cal. Nov. 5, 2012)........................................................12

*Webb v. Cleverbridge, Inc. et al.*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) ........... 1 n.2, 2, 14

**State Court Cases:**

*Drymon, et al. v. Cyberdefender Corp.*,
    No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011) ................................. 1 n.2, 14

**Miscellaneous:**

28 U.S.C. § 1715 .............................................................................................................. 18

Fed. R. Civ. P. 23 .............................................................................................................. 9

*Federal Judicial Center, Judges' Class Action Notice and
    Claims Process Checklist and Plain Language Guide* (2010)........................................ 9-10

I.       **INTRODUCTION**

The instant class action settlement is a significant achievement for the Settlement Class[1] and the culmination of more than a year-long effort—through litigation, discovery, informal discussions and mediation—to resolve Plaintiffs' claims challenging the alleged deceptive design and marketing of two of Defendants Support.com's and AOL's Software Products— Support.com's Advanced Registry Optimizer ("ARO") and AOL's Computer Checkup. The settlement provides a wide range of relief to the Settlement Class—in the form of monetary and in-kind benefits, and industry-leading modifications to the Software Products to bring their functional mechanisms and disclosures in line with consumer expectations—and is consistent with or even better than other settlements with Defendants' industry competitors that have been finally approved by state and federal courts throughout the country.[2] In accordance with the Court's Order preliminarily approving the settlement, the Parties, with the assistance of Claims Administrator Epiq Systems, have fully implemented the Court-approved Notice Plan, which included (i) direct e-mail notice that reached an almost unprecedented 92% of the Settlement Class, (ii) the publication of a Settlement Website, which allowed Class members to submit claims online or download Claim Forms, and review all relevant Court documents, and (iii) CAFA notice to the relevant governmental agencies.[3] The deadline to submit requests for exclusion and to file

---

[1]      Unless otherwise stated herein, capitalized terms shall have the same meaning as set forth in the Parties' Stipulation of Class Action Settlement (the "Agreement"), attached as Exhibit 1.

[2]      The settlements reached with Defendants' industry competitors and finally approved are as follows: (i) *Ledet v. Ascentive LLC*, No. 2:11-CV-295-PBT (E.D. Pa. Jan. 18, 2011) (creating a $9.6 million settlement fund from which class members could make a claim for either $10.00 or $18.00 depending on the type of software purchased, and prospective relief prohibiting defendant from overstating the severity of errors and requiring additional disclosures to consumers about the nature of the software); (ii) *Drymon, et al. v. Cyberdefender Corp.*, No. 11-CH-16779 (Cir. Ct. Cook County, Ill. May 6, 2011) (Hon. K. Pantle, presiding) (creating $9.75 million settlement fund from which class members could make a claim for $10.00 for each software product purchased, and prospective relief requiring defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself); and (iii) *Webb v. Cleverbridge, Inc. et al.*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011) (creating $4 million settlement fund from which class members could make a claim for $8.50, and prospective relief requiring clear disclosure of any automatic renewal, information about the renewal dates and charges, and a simple method of cancelling future renewal charges).

[3]      It is noteworthy that notice was sent to the appropriate officials of each state, as well as the Attorney General of the United States, and not a single concern about or objection to the settlement was raised. To be clear, this is not to say that the Attorney General or state officials

1  objections has now passed and the response from the Settlement Class has been overwhelmingly

2  favorable—not a single objection to the Settlement has been raised and just three (3) Class

3  members have requested to be excluded.

4      The favorable reaction of the Class is not surprising given that, under the terms of the

5  settlement, Defendants have agreed to modify the underlying source code of the Software

6  Products so that they more accurately identify the functions they perform and the discrete errors

7  detected and repaired on a user's computer as a result. Defendants have further agreed to include

8  within the Software itself prominent links to additional disclosures about the Software's overall

9  functionality, including explanations of the methodologies used in scanning and repairing users'

10  computers, the types of errors the Software is capable of detecting, reporting and repairing, and the

11  actual threat those errors pose to a user's computer (if any).

12      Additionally, Defendants have agreed to create an $8.595 million Settlement Fund from

13  which Settlement Class members will be entitled to claim $10.00 for each purchase of the

14  Software Products, and from which notice and claims administration expenses, attorneys' fees and

15  costs, and incentive awards will be paid. Setting itself apart from the other class action settlements

16  reached with Defendants' industry partners—most recently in the cases of *Ledet v. Ascentive LLC*,

17  No. 2:11-CV-295-PBT and *Webb v. Cleverbridge, Inc. et al*, No. 1:11-cv-04141—this settlement

18  also calls for Defendants to automatically provide three months of free access to Support.com's

19  proprietary anti-spyware software known as SUPERAntiSpyware 5 to each member of the

20  Settlement Class regardless of whether they make a claim under the settlement. This in-kind

21  benefit represents an additional $7.50 value to each Class member and more than $5.6 million

22  total.

23      In the end, the exceptional results achieved coupled with the positive response from the

24  Settlement Class indicates that the settlement is fair, reasonable and adequate, and warrants final

25  approval by the Court. For these reasons, and as discussed further below, Plaintiffs respectfully

26  request that the Court grant final approval of the Parties' settlement and dismiss all Released

27

28  have necessarily blessed the settlement, but the complete lack of opposition certainly informs the
   discussion of its strength, fairness and reasonableness.

1  Claims with prejudice.[4]

2  **II.   FACTUAL BACKGROUND**

3      **A.   Plaintiffs' Allegations Regarding Defendants' Design and Marketing of the Software Products.**

On August 6, 2012, Plaintiffs' filed their Second Amended Complaint (the "Complaint") in this Court. (Dkt. 39, cited herein as "Compl.") In the Complaint, Plaintiffs allege that regardless of their branding, ARO and Computer Checkup have virtually identical functionality and are marketed by Defendants in essentially the same deceptive manner. Through their websites and online marketing materials, Defendants represent that the Software Products accurately identify, report, and repair an array of computer errors, security threats, and other problems, and that they will increase the speed, performance, and stability of a consumer's PC. (Compl. ¶¶ 3, 15-18.) To demonstrate the Software's supposed utility, Defendants offer a "free diagnostic" scan, which purports to detect errors and other problems on a user's computer.[5] (*Id.* ¶¶ 20-21.) After running the free scan, however, the Software invariably reports that there are numerous—often "critical"—errors and other problems affecting the user's computer and represents that it can fix the supposed errors, but only if the consumer registers and pays for a full version of the Software—typically $29 for ARO and $4.99 per month for Computer Checkup.[6] (*Id.* ¶¶ 22-26, 29.)

Plaintiffs allege further that contrary to Defendants' representations, neither ARO nor Computer Checkup was designed to perform as advertised. (*Id.* ¶¶ 4-5, 19, 27-29.) Rather, it is alleged that Support.com intentionally designed the Software Products to overstate the severity of errors and the overall health (or lack thereof) of consumers' PCs, causing consumers to pay for full versions of the Products. (*Id.* ¶¶ 19, 27-29.) Consumers are similarly induced to continue using the Products based upon continuing in-software representations about the purported low health and security status of their

---

[4]    A proposed Final Judgment Order is attached as Exhibit 4. The proposed order also accounts for the relief requested in Plaintiffs' previously-filed motion for approval of the proposed Fee Award and incentive award. (Dkt. 51.)

[5]    Unlike Support.com's ARO software, AOL offers a diagnostic scan in conjunction with a "free 30-day trial" of Computer Checkup.

[6]    The average duration of a consumer's subscription to Computer Checkup is between four and five months. (*See* Dkt. 47-1.)

computers—representations that correspond to the types of problems Defendants' advertising materials represent the Software is capable of remedying. (Compl. ¶¶ 19, 27-29.)

Plaintiffs LaGarde and Batchelor are just two of the more than 750,000 consumers who viewed and relied upon Defendants' representations regarding the functionality of the Software Products and purchased and used full versions of them as a result. (*Id.* ¶¶ 31-42; Dkt. 47-1.)

**B.     Plaintiffs' Expert Confirms that the Software Products do not Function as Advertised.**

Prior to filing this action, Plaintiffs' counsel conducted an in-depth investigation into perceived discrepancies between the advertised and actual functionality of ARO and Computer Checkup. Counsel's investigation included several data points from consumer awareness of the issue to the actual functionality of the Software Products. (Compl. ¶¶ 27-29.) As part of that investigation, Plaintiffs' counsel also engaged a computer forensics expert to examine the functionality of both ARO and Computer Checkup. (*Id.*) The expert ran a series of diagnostic tests in a controlled environment and his ultimate conclusion was that both pieces of Software were designed to invariably report the existence of numerous purported errors, to characterize harmless files as significant problems, and to display the overall health of a computer as "critical", regardless of its actual condition. (*Id.*)

**C.     The Litigation, Negotiations, and Settlement.**

Plaintiff LaGarde originally filed this Action on February 7, 2012, alleging claims against only Support.com related to the alleged deceptive design and marketing of its ARO software. (Dkt. 1.) Shortly thereafter, Support.com moved to dismiss LaGarde's original complaint. (Dkt. 20.) In response, LaGarde filed an amended complaint. (Dkts. 22-23.) Support.com again moved to dismiss, arguing, *inter alia*, that the amended complaint failed to satisfy Rule 9(b)'s heightened pleading standard and that it had disclaimed any alleged warranties regarding ARO's functionality. (Dkt. 25.) Following full briefing by the Parties and oral argument, the Court granted the motion to dismiss without prejudice to LaGarde's filing of an amended complaint, which he and Batchelor did on August 6th. (Dkts. 36, 39.)

Plaintiff Batchelor originally filed his case in the United States District Court for the Southern District of New York (captioned *Batchelor v. AOL, Inc. et al.*, No. 1:12-cv-00963-JSR

(the "*Batchelor* matter")) against AOL and a now dissolved subsidiary of Support.com related to the alleged deceptive design and marketing of the Computer Checkup software. AOL initially moved to dismiss Batchelor's complaint under Rule 12(b)(6) for failure to state a claim and further moved to have the case transferred to AOL's home district in Virginia. (*Batchelor* matter, Dkts. 19-24.) During the pendency of those motions, Batchelor served and AOL responded to written discovery requests, including interrogatories and production requests. (*See* Declaration of Rafey S. Balabanian ¶ 3, attached as Exhibit 2.) Batchelor ended up voluntarily dismissing his case, however, given that Support.com designed Computer Checkup and a great deal of the evidence relevant to his claims was in its possession in San Francisco, and thereafter joined this case through the filing of the Second Amended Complaint.

Throughout the pendency of this and the *Batchelor* matter, the Parties exchanged information through both formal and informal discovery requests and simultaneously explored the potential for resolution of both cases. (*Id.*) On March 7, 2012, the Parties held an initial in-person meeting (through counsel) during which Plaintiffs' counsel presented their expert's conclusions about the Software Products and their underlying methodologies. (*Id.* ¶ 4.) Although no settlement was reached at that time, the Parties at least agreed to continue talking as the litigation progressed. (*Id.*) Through their on-going discussions, the Parties eventually decided to convene a private mediation aimed at resolving the claims related to both ARO and Computer Checkup. (*Id.* ¶ 5.) On June 18, 2012, the Parties held an all-day private mediation session before Randall Wulff of Wulff Quinby Sochynsky in Oakland, California. (*Id.* ¶ 6.)

With the assistance of Mr. Wulff, the Parties were able to reach an agreement in principle as to the primary terms of a class wide settlement. (*Id.* ¶ 7.) But, it would take several more weeks of discussions after that to finalize the ancillary terms of the settlement and reduce it to writing in the form of the Parties' Stipulation of Class Action Settlement. (*Id.*)

### D.     Preliminary Approval of the Proposed Settlement.

On August 22nd, Plaintiffs filed their motion for preliminary approval of the settlement. (Dkt. 42.) On September 27, 2012, the Court held a hearing on Plaintiffs' motion. During the hearing the Court requested that the Parties provide several additional pieces of information

regarding the factual circumstances surrounding the settlement and suggested that (i) the Release provided to Defendants under the settlement could be narrowed, (ii) the proposed Claim Form could be modified to make it less onerous for Settlement Class members to complete, by removing questions about the Product's date and source of purchase, and making the provision of phone numbers optional, and (iii) a mechanism could be added to the Agreement to provide additional incentives to enforce and abide by its terms, particularly, its injunctive provisions. (*See* Dkt. 47-1.)

Addressing each of those points, Plaintiffs conferred with Defendants and the Claims Administrator, and through the declarations of Class Counsel and the Claims Administrator, Mallory Sander of Epiq Systems, submitted all of the additional information the Court sought. (Dkts. 47-1, 47-2.) Additionally, the Parties negotiated and fully executed an Addendum to their Agreement, which provides for a narrower Release, mutual fee shifting in the event any Party seeks to enforce any of the payment and/or injunctive provisions of the Agreement, and modified the proposed Claim Form to enhance the ease with which Settlement Class members could make claims under the settlement, including by removing the questions about the date and source of purchase, and making the provision of a phone number optional. (Dkt. 47-1.)

Satisfied with the Parties' supplemental submissions, on November 2nd, the Court entered an Order granting preliminary approval of the settlement and directing the Parties to, *inter alia*, effectuate the Notice Plan contemplated by their Agreement. (Dkt. 50.) As explained further below, the Parties have now fully complied with the Court's Order, effectuated the Notice Plan with an almost unprecedented deliverability rate, and the settlement has received a favorable response from the Settlement Class.

**E.  Defendants' Defenses and Denials.**

At all times, Defendants have denied and continue to deny any wrongdoing whatsoever and have denied and continue to deny that they have committed, or threatened or attempted to commit, any wrongful act or violation of law or duty alleged in this Action and the *Batchelor* matter. (*See* Settlement Agreement § III.) Nonetheless, taking into account the uncertainty and risks inherent in any litigation, Defendants have concluded that further defense of this Action would be protracted, risky, burdensome, and expensive, and that it is desirable and beneficial that

1  the claims at issue here be fully and finally settled and terminated in the manner and upon the

2  terms and conditions set forth in the Parties' settlement Agreement. (*Id*.)

3  **III.   TERMS OF THE SETTLEMENT**

4      The terms of the Parties' settlement are summarized as follows:

5      **A.   Class Definition:** The Settlement Class includes all individuals and entities in the

6  United States and its territories that have paid monies for any version of Defendants' Advanced

7  Registry Optimizer and/or Computer Checkup software at any time until November 2, 2012.

8  (Settlement Agreement § II.)

9      **B.   Prospective Relief:**

10      ***1.   Improvements to the Software Products*:** Support.com has agreed to

11  modify the source code of its ARO software to: (i) create a clear visual distinction between the

12  "Junk Status" and "Security Status" reporting functions within the main Graphical User Interface

13  ("GUI") displayed to users following the performance of a diagnostic scan, so that it is apparent

14  that such reports correspond with the detection of distinct error types, and (ii) include active links

15  within the software's GUI that, upon clicking, redirect the user to a display screen (or website)

16  containing documentation that clearly explains the detection and reporting methodologies

17  underlying the operations of ARO's diagnostic scan. (*Id.* § VI.A.)

18      Defendants have also agreed to modify the source code of Computer Checkup to include

19  active links within the software's GUI that, upon clicking, redirect the user to a display screen (or

20  website) that contains documentation clearly explaining the detection and reporting methodologies

21  underlying the operations of Computer Checkup's diagnostic scan. (*Id*.)

22      ***2.   New Documentation Explaining the Software's Functionality*:**

23  Support.com has further agreed to create documentation that explains, in a clear and concise

24  manner, the meaning of "Junk" and "Security" status reports displayed to users upon completion

25  of a diagnostic scan using ARO. Additionally, the documentation shall describe, in layman's

26  terms, the actual risks to their computers posed by the errors and other problems detected by the

27  software that informed such reports. (*Id.* § VI.B.)

28      Likewise, Defendants will create documentation that explains, in a clear and concise

manner, the meaning of the "Secure," "Clean," and "Optimization" System Status reports displayed to users upon completion of a Computer Checkup diagnostic scan. In addition, the documentation shall describe, in layman's terms, the actual risks to their computers posed by the errors and other problems detected by the software that informed such reports, including "privacy items," "junk items," "registry errors," and "outdated drivers." (Settlement Agreement § VI.B.)

**C.    Monetary Relief:** Defendants have agreed to create a non-segregated Settlement Fund in the amount of $8,595,000.00, to be used for the payment of Valid Claims of the Settlement Class members, notice and administration expenses, a collective incentive award to the Class Representatives and an award of attorneys' fees and reimbursement of expenses to Class Counsel. (*Id.* § VI.C.)

Each Settlement Class member that submits a valid Claim Form will be entitled to receive a payment by check of $10.00 for each purchase of the ARO and/or Computer Checkup software, to be paid from the Settlement Fund. (*Id.* § VI.C.2.)

**D.    Other Relief:** In addition to the individual and prospective relief described above, Defendants have agreed to the following relief.

***1.    Anti-Spyware Software:*** Each Settlement Class member will be entitled to receive three (3) months of free access to Support.com's anti-spyware software known as SUPERAntiSpyware 5. (*Id.* § VI.C.3.)

***2.    Payment of Notice and Administrative Expenses:*** Defendants have agreed to pay all notice and administration expenses, up to $100,000. Any overage will come out of the attorneys' fees awarded to Class Counsel. All Settlement Administration Expenses will be paid out of the Settlement Fund. (*Id.* §§ II, VI.C.)

***3.    Compensation for the Class Representatives:*** Defendants have agreed to pay from the Settlement Fund, subject to Court approval, a collective incentive award to the Class Representatives in the total amount of $5,000.00, as appropriate compensation for their time and efforts in the Action and achieving the benefits provided to the Settlement Class under the settlement. (*Id.* § XI.A.) The collective incentive award shall be divided equally among the Class Representatives. (*Id.*)

**4.** ***Payment of Attorneys' Fees and Expenses***: Defendants have agreed that Class Counsel may apply for and they will pay a Fee Award, subject to Court approval, of $900,000.00 (less any notice expenses in accordance with Section III.D.2 of the Agreement), which shall include attorneys' fees and reimbursement of expenses associated with this Action, as well as the *Batchelor* Matter. (Settlement Agreement § XI.B.)

**E.** **Release:** Upon the entry of the Judgment, and in consideration of the Settlement Benefits, each Settlement Class member shall be deemed to have released, acquitted and forever discharged Defendants and each of the Released Parties from any and all Claims or Causes of Action (the "Released Claims"). (*Id.* § V.)

## IV.    NOTICE WAS PROVIDED TO THE CLASS AND DUE PROCESS SATISFIED

Prior to granting final approval of the settlement, Fed. R. Civ. P. 23(c)(2) requires that the Court consider whether the notice to the Settlement Class was the "best notice [] practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). While the "best notice practicable" includes individual notice to be sent "to all members who can be identified through reasonable effort[,]" Fed. R. Civ. P. 23(c)(2), it does not require actual receipt of notice by all members of a class in order to comport with both Rule 23 and due process requirements. Instead, the Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p. 3.

Here, the Court-approved Notice Plan included both direct notice via email to the last known email address of each Settlement Class member (provided during their purchase of the Software Products) as well as the publication of a Settlement Website,[7] which itself allows uninterrupted access to important case documents like the Court's Preliminary Approval Order, the Parties' Settlement Agreement, the Notice and a downloadable Claim Form, and provided for the submission

---

[7]    The Settlement Website—www.lagardesettlement.com—which went live on November 21, 2012 and will remain active until after final approval of the settlement, the appeals period has run, and all Class member claims have been paid. (*See* Declaration of Mallory Sander ¶ 18, attached as Exhibit 3.)

of Class member claims online.[8] Additionally, the Claims Administrator established and operated a toll-free telephone line through which Class members could obtain information about the settlement, request copies of the Notice and Claim Form, and receive assistance with submitting claims. (Sander Decl. ¶ 20.)

The Notice Plan was incredibly successful in reaching the Settlement Class. Indeed, the e-mail notice was delivered to more than 92% of the 759,000 Settlement Class member e-mail addresses, far surpassing the requisite 70%. (*See* Sander Decl. ¶¶ 12-14); *see also Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), p. 3. That success was due, in large part, to the multi-step approach Claims Administrator Epiq Systems took here. First, Epiq confirmed that there were no duplicate e-mails on the list of Settlement Class members to whom the Notice would be sent. (Sander Decl. ¶ 6.) Then, it ensured that the "From" display and address fields, and subject line included terms that could easily be recognized by the Class. (*Id.* ¶¶ 7, 9.) Each email also contained an opt-out option so Class members could prevent the receipt of future mailings. (*Id.* ¶ 8.) And, both a text and HTML version of the e-mail Notice were sent simultaneously in batches of 25,000—measures that have been proven to increase email delivery rate. (*Id.* ¶¶ 10-11.) After the initial round of email Notice was sent, Epiq also employed safeguards to identify undeliverable emails and took steps to resend them, including identifying "soft" bounce-backs and monitoring an e-mail inbox to respond to "captcha" and other requests to be completed before an e-mail could be successfully delivered. (*Id.* ¶¶ 13-15.)

Under these circumstances, it's clear that direct notice of the settlement has been disseminated to the Settlement Class by the best methods practicable and thus, due process has been satisfied.

## V.    THE SETTLEMENT WARRANTS FINAL APPROVAL

After determining that notice was successfully disseminated and meets the rigors of Rule 23 and due process, the Court must determine whether the proposed settlement warrants final approval:

---

[8]    The Notice provided to the Settlement Class was neutral in tone and provided Class members with a detailed explanation of their rights under the settlement, including how to obtain the available Settlement Benefits, how to "opt-out" of the settlement, and how to comment in support of or in opposition to it. (*See* Sander Decl., Ex. A.) This information gave Settlement Class members the ability to make an informed decision about their participation (or not) in the settlement.

1  whether it is fundamentally fair, adequate, and reasonable. *Officers for Justice v. Civil Serv. Comm'n*

2  *of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217

3  (1983)). In order to evaluate the fairness, reasonableness, and adequacy of a proposed settlement,

4  courts in the Ninth Circuit typically weigh the following non-exhaustive list of factors: "(1) the

5  strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further

6  litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered

7  in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the

8  experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction

9  of the class members to the proposed settlement." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566,

10  575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)); *see also*

11  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012). No one factor controls, and the

12  "importance to be attached to any particular factor will depend upon…the nature of the claim(s)

13  advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each

14  individual case." *Officers for Justice*, 688 F.2d at 625.

15           There is a "strong judicial policy [] favors settlements, particularly where complex class

16  action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.

17  1992). And, judges are encouraged to give proper deference "to the private consensual decision of

18  the parties." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL

19  1687832, at *8 (N.D. Cal. Apr. 22, 2010) (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948,

20  965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive,

21  negotiated resolution….")). For these reasons, in "the Ninth Circuit, a court affords a presumption of

22  fairness to a settlement if: (1) the negotiations occurred at arm's length; (2) there was sufficient

23  discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a

24  small fraction of the class objected." *Romero v. Producers Dairy Foods, Inc.*, No. 05-cv-0484, 2007

25  WL 3492841, at *2 (E.D. Cal. Nov. 14, 2007).

26           Here, the settlement should be presumed fair, as the Parties' negotiations that led to it were

27  conducted at arms' length by experienced counsel, with the assistance of third-party neutral Mr.

28  Wulff, and only after the Parties had sufficient information—gathered through both formal and

informal discovery—about the alleged conduct at issue and the contours of the proposed Settlement Class. Moreover, not a single objection has been raised to the settlement. But, even if that weren't the case (it is), as explained further below, the settlement easily satisfies each of the factors to be considered by the Court and therefore, warrants final approval.

A.      **The Strength of Plaintiffs' Case Compared to the Relief Afforded by the Settlement and the Risks of Continued Litigation.**

The first and second factors courts look to in analyzing the fairness, reasonableness, and adequacy of a settlement are the strength of the plaintiff's case and the range of possible recovery in light of the risks of continued litigation. *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012); *see also In re Omnivision*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). This calls for balancing "the vagaries of litigation and [] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004); *see also Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.").

The analysis of a plaintiff's probability of success, however, does not require a rigid formula or an ultimate conclusion on the merits by the court. *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965; *Officers for Justice*, 688 F.2d at 625). Instead, "the Court's assessment of the likelihood of success is nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'" *Garner*, 2010 WL 1687832, at *9 (citing *Officers for Justice*, 688 F.2d at 625). Thus, "the Court may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

In this case, although Plaintiffs and Class Counsel are confident in the strength of their claims, as in every class action, there was a significant risk that this litigation would result in a lesser recovery for the Class, or no recovery at all. From the outset of the litigation, Defendants

and their counsel raised a vigorous defense of the claims at issue, including numerous legal challenges—e.g., relying upon the existence and applicability of additional contractual terms between the Parties—that (if applicable) may have reduced or eliminated certain of Defendants' liability. (Balabanian Decl. ¶ 8.) Similarly, Plaintiffs' and the Class's recoveries would have ultimately turned on the resolution of several complicated factual issues regarding the underlying technical design and functionality of the Software Products, which itself would have been extremely costly, time consuming, and involved the hiring of additional experts, taking of additional written discovery, and numerous depositions. (*Id.* ¶ 9.) And, even if Plaintiffs were successful in overcoming those challenges, given the amount of damages at issue, Defendants were likely to appeal any decision on the merits, thereby further delaying (and making uncertain) any recovery by the Class. (*Id.* ¶ 10.) This, weighed against the certain relief obtained for the Class, demonstrates that the settlement is more than fair, reasonable and adequate.

     In particular, under the terms of the settlement, Defendants have established a Settlement Fund sufficient in size to compensate Class members for the damages they allegedly suffered by overpaying for the Software Products. (*Id.* ¶ 12.) Further, the Fund is also sufficient to pay the costs of Notice and administration of the Settlement,[9] attorneys' fees and a collective incentive award to Plaintiffs as Class Representatives. (Settlement Agreement § VI.C.) With respect to individual Class members, with only a minimal showing, they are each entitled to receive a cash payment of $10 for each purchase of the Software Products at issue, without any cap on the number of purchases for which they can receive such a benefit. (*Id.* § VI.C.2.) Because Plaintiffs do not allege that the Software Products were without any utility whatsoever,[10] a recovery of $10 (of the typical $20-$29 cost to consumers) is significant and represents nearly a complete recovery on Plaintiffs' theory that the Class overpaid for the Software. (Balabanian Decl. ¶ 12.)

---

[9]     Defendants have agreed to pay all Notice and administration expenses, up to $100,000. Any overage will come out of the attorneys' fees awarded to Class Counsel. (Settlement Agreement §§ II, VI.C.)

[10]     Class Counsel's analysis suggests that design issues, without any attendant disclosures or notice to customers of the types of errors the Software would identify, report and repair, resulted in a reduction in the value of the Software Products. (Balabanian Decl. ¶ 12.) Thus, a return of $10 for each software purchase represents a significant return on the difference between the Software's actual value and the purchase price paid by consumers. (*Id.*)

The prospective component of the Settlement is just as meaningful. Defendants have agreed to modify the source code of their Software Products to (i) create clear visual distinctions between the reporting functions within the main GUI displayed to users following the performance of a diagnostic scan, so that—going forward—it's apparent that such reports correspond with the detection of distinct error types, and (ii) include active links within the Products' GUI that, upon clicking, redirect the user to a display screen (or website) containing documentation that clearly explains the detection and reporting methodologies underlying the operations of their diagnostic scans. (Settlement Agreement § VI.A.) Defendants have further agreed that the documentation will, in a clear and concise manner, disclose the meaning of the status reports displayed to users upon completion of a diagnostic scan and describe, in layman's terms, the actual risks to their computers posed by the errors and other problems detected by the Software. (*Id.* § VI.B.)

Finally, the in-kind component of the settlement provides real and tangible benefits to the Class as well. That is, Defendants will provide three months of free access to Support.com's proprietary SUPERAntiSpyware 5 software to each and every Class member, regardless of whether they've submitted a Claim Form under the settlement. As the Court recognized in its preliminary approval Order, with a retail value of $29.95 per year, the three months of free access to the spyware software is valued at approximately $7.50 per Class member, totaling more than $5.6 million in additional relief to the Class as a whole.[11] (Dkts. 47-1, 50.) This in-kind benefit also represents a significant increase in the amount of relief provided to the Class as compared to the other settlements in the industry, which did not include such a component but nevertheless were found to be fair, reasonable and adequate, and were granted final approval. *See Ledet*, No. 2:11-CV-295-PBT; *Drymon*, No. 11-CH-16779; *Webb*, No. 1:11-cv-04141 (N.D. Ill. June 17, 2011).

---

[11]     Settlement Class members will receive access to the free software via e-mail from the Claims Administrator, which will include a one-time activation code. Settlement Class members will not be required to provide Defendants any information other than the activation code to access the software. Following their receipt of the three months of free service, each Settlement Class member will have the option to either continue with a paid subscription to the Professional Edition of the software, convert to the Free Edition, or cease using it altogether. However, under no circumstances will Defendants auto-convert any such use to a paid subscription. (Dkt. 47-1.)

1      Thus, as a whole, the Settlement represents more than $14 million in relief and a

2  substantial recovery to the Class, especially in light of the risks that Class members could have

3  recovered less, or nothing at all, if the litigation proceeded through trial and appeals. Accordingly,

4  the Court should find that the first and second factors are satisfied.

5          **B.        The Risk of Maintaining Class Action Status.**

6      Courts next consider the risk of maintaining class action status throughout the litigation.

7  *Officers for Justice*, 688 F.2d at 625. This factor does not require a plaintiff to have already moved

8  for class certification as long as pre-certification concerns validate the risks both parties face should

9  a plaintiff succeed or fail in certifying the class. *See Gardner v. GC Servs.*, *LP,* No. 10-CV-0997-

10 IEG CAB, 2012 WL 1119534, at *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk class certification

11 poses for both parties and acknowledging the benefits of settlement prior thereto).

12     Class Counsel are confident that given the uniform nature of Defendants' alleged conduct,

13 certification is proper for this Class. For example, key common issues for the Class include: (i)

14 whether Defendants intentionally designed the software to falsely report the existence of errors on

15 users' computers, (ii) whether the Software Products exaggerate the severity and existence of errors

16 detected on users' computers, (iii) whether the Software and related marketing materials were

17 intentionally designed to deceive consumers into purchasing the full versions of the Software, and

18 (iv) whether the Class members overpaid for the Software that couldn't perform as advertised. *See*

19 *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556 (2011) (explaining that commonality is

20 found where the claims of all class members "depend upon a common contention," and "even a

21 single common question will do").

22     Again, despite their confidence, prevailing on an adversarial motion for class certification is

23 by no means certain for Plaintiffs. Defendants will no doubt attempt to establish that the Software

24 had at least some utility (as Plaintiffs concede) and raise numerous colorable arguments as to

25 potential individual issues that could make certification inappropriate—e.g., variations in the

26 conditions of users' computers and the effects that they may have on the Software's functionality.

27 Ultimately, failure to certify the Class would mean an immediate end to Plaintiffs' claims on their

28

1  behalf and a total lack of recovery. By contrast, a loss at the class certification stage would pose

2  severe consequences for Defendants for the remainder of the litigation.

3       Given the risks associated with certification for both sides, the Court should find that this

4  factor also weighs in favor of final approval.

5       **C.     The Amount Offered in Settlement.**

6       Next, in analyzing the overall amount offered under the settlement, the Court should

7  consider "the complete package" rather than the individual terms to determine the settlement's

8  fairness. *Officers for Justice*, 688 F.2d at 628. Thus, even if the amount of settlement is "only a

9  fraction of recovery," final approval may still be proper, especially when "monetary relief is but one

10 form of the relief…." *Id.* Even considering the total amount offered, "[t]his circuit has long deferred

11 to the private consensual decision of the parties." *Rodriguez*, 563 F.3d at 965. In fact, where the

12 settlement is the result of "an arm's-length, non-collusive, negotiated resolution," courts "put a good

13 deal of stock" in the agreement reached by the parties. *Id.* (citing *Hanlon*, 150 F.3d at 1027)

14 (recognizing that "parties, counsel, mediators, and district judges naturally arrive at a reasonable

15 range for settlement….").

16      Here, the negotiated relief was reached only after arms' length negotiations by experienced

17 counsel and "is fair and reasonable no matter how you slice it." *Id.* Under the settlement, each Class

18 member is entitled to claim a cash payment of $10 for each purchase of the Software from an $8.595

19 million Settlement Fund. (Settlement Agreement § VI.C.2.) Each Class member will also receive

20 significant in-kind relief in the form of access to three free months of SUPERAntiSpyware 5

21 Professional Edition software—valued at approximately $7.50 per Class member, or $5.6 million

22 total—regardless of whether they submit a claim. (*Id*. § VI.C.3.) And, in addition to the monetary

23 and in-kind benefits provided to the Class, Defendants have also agreed to strong prospective

24 measures that will modify the source code underlying the Software Products to provide clarity as to

25 the functionality of and results generated by the Software, as well as additional documentation

26 explaining those processes and the errors and problems actually affecting users' computers.

27      As such, there should be no question that the amount of relief provided to the Settlement

28 Class militates in favor of final approval as well.

### D.      The Extent of Discovery and Stage of Litigation.

The next factor focuses on the extent of discovery completed and the stage of the litigation when the settlement occurred. *See OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego*, 213 F. 3d at 459)). So "long as the parties have sufficient information to make an informed decision about settlement, formal discovery is not a necessary ticket to the bargaining table." *Gardner*, 2012 WL 1119534, at *5 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)) (internal quotations omitted). Rather, all that is required is that the parties reach a point in the litigation where they understand their respective strengths and weaknesses. *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-cv-01413-W-AJB, 2008 WL 5458986, at *8 (S.D. Cal. Dec. 10, 2008) (quoting *In re Warner Comm'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)). In the end, a compromise based on an understanding of the legal and factual issues and a "genuine arms-length negotiation is presumed fair." *Nat'l Rural Telecomms.*, 221 F.R.D. at 528 (citations omitted).

Throughout this litigation, the Parties have continually explored the strengths and weaknesses of their respective claims and defenses through formal discovery, informal exchanges of information and private settlement discussions. (Balabanian Decl. ¶ 3.) The Parties have also engaged in extensive briefing on several substantive motions aimed at testing the sufficiency of Plaintiffs' claims and several of Defendants' potential defenses. (Dkts. 20-23, 25-26, 33-34, 36; *Batchelor* matter, Dkts. 19-24.) In so doing, the Parties were able to gather the information necessary to properly evaluate their respective claims and defenses and ultimately, negotiate the settlement now before the Court. As recognized in the Court's preliminary approval Order, the litigation to date and the information available to the Parties and the Court suggest that the settlement is a fair, reasonable and adequate result for the Settlement Class, and that continues to be true.

This factor weighs in favor of final approval too.

### E.      The Experience and Views of Counsel.

Courts also consistently defer to the settlements reached by experienced counsel given that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). In fact, "[t]he recommendations of plaintiff's counsel should be given a

presumption of reasonableness." *OmniVision*, 559 F. Supp. 2d at 1043 (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). This presumption is strengthened when class counsel has specific experience in the type of claims being litigated. *See Martin v. Ameripride Serv., Inc.*, No. 08-cv-440-MMA (JMA), 2011 WL 2313604, at *7 (S.D. Cal. June 9, 2011); *see also Nat'l Rural Telcomms.*, 221 F.R.D. at 528 ("'[g]reat weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").

Class Counsel have significant experience litigating consumer class actions of similar size, scope and complexity to the instance case, and have been appointed class counsel in numerous other cases by courts throughout the country. (*See* Edelson McGuire LLC Firm Resume, attached as Exhibit 2-A to the Balabanian Declaration.) In addition to their complex and class action experience generally, they have developed a unique and specific set of expertise while prosecuting more than a dozen similar nationwide class actions related to claims against Defendants' industry competitors for their own alleged deceptive design and marketing of utility software products. (Balabanian Decl. ¶ 14.) It was with that experience that they investigated and analyzed Plaintiffs' and the Class's claims, Defendants' potential defenses, the formal and informal discovery produced by Defendants, and ultimately, negotiated the settlement now before the Court. With all of that in mind and faced with a formidable opposition by defense counsel from a prominent law firm experienced in complex litigation, Class Counsel is confident that the settlement is an exceptional result for the Settlement Class. (*Id.* ¶ 15.)

As such, this factor also weighs in favor of final approval of the settlement.

**F.    The Presence of a Governmental Participant.**

There were no "governmental coattails for the class to ride" in this case, *Rodriguez*, 563 F.3d at 964, but Defendants were nonetheless obligated to notify the United States Attorney General and appropriate state officials as a condition of obtaining Court approval. 28 U.S.C. § 1715; *Garner*, 2010 WL 1687832, at *14. "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner*, 2010 WL

1687832, at *14. The Parties complied with CAFA's notice requirement and provided the requisite notice on September 26, 2012. (Sander Decl. ¶ 4.) To date, no state or federal official has raised any objection to the settlement. Accordingly, this factor also favors final approval.

### G.  The Reaction of Settlement Class Members.

The overwhelmingly positive reaction of the Settlement Class also favors final approval. *Garner*, 2010 WL 1687832, at *14. As stated above, more than 92% of the Class received direct notice of the settlement, but not a single objection to the settlement was raised and only three Class members have sought exclusion. *See Garner*, 2010 WL 1687832, at *14 ("Courts have repeatedly recognized 'that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.'" (quoting *Nat'l Rural Telecomms.*, 221 F.R.D. at 529)); *see also Churchill Vill.*, 361 F.3d at 577 (affirming the district court's approval where 45 of 90,000 notified class members objected to the settlement and 500 class members opted out of the settlement); *In re Mego*, 213 F.3d at 459 (final approval granted in settlement with one objection out of a potential class of 5,400). Such robust Notice, coupled with the complete lack of opposition to the settlement, makes clear that the members of the Settlement Class are aware of and have found the settlement to be fair, reasonable and adequate to resolve their claims. *See In re AT & T Mobility Wireless Data Serv. Sales Litig.*, 270 F.R.D. 330, 349 (N.D. Ill. 2010) ("silence [of a class]…coupled with other indicia of fairness…provides further support of approval.").

The absence of any objections—and mere presence of two exclusions—weighs heavily in favor of final approval.

### H.  The Absence of Collusion in Reaching the Settlement Precludes Additional Scrutiny and Favors Final Approval.

In addition to the other factors, where, as here, a settlement is reached prior to class certification, courts often require a higher standard of fairness "to ensure class counsel and defendant have not colluded in settling the case." *Martin*, 2011 WL 2313604, at *5 (citing *Hanlon*, 150 F.3d at 1026). The factors most indicative of collusion between the parties are "(1) when counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution

1   but class counsel are amply rewarded; (2) when the parties negotiate a clear sailing arrangement

2   providing for the payment of attorneys' fees separate and apart from class funds;…and (3) when the

3   parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."

4   *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal citations and

5   quotations omitted). None of these "warning signs" is present here.

6        First, Class Counsel is not receiving a disproportionate amount of the Settlement Fund.

7   Rather, the proposed Fee Award amounts to just 9.95% of the Settlement Fund and just over 6% of

8   the total cash and in-kind benefits combined.[12] (*See* Dkt. 51.) These amounts fall well below the

9   Ninth Circuit's benchmark of 25% in common fund cases, *In re Bluetooth*, 654 F.3d at 942, and

10   even further below the Ninth Circuit's typical fee award of 30-50% in cases with a total recovery of

11   less than $50 million. *See Martin*, 2011 WL 2313604, at *8. In addition, rather than seek attorneys'

12   fees separate and apart from funds paid to the Class, Class Counsel seeks the Fee Award as a

13   percentage of the total value created by the settlement, further weighing in favor of a finding of

14   fairness and reasonableness. *See Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003); *In re*

15   *Bluetooth*, 654 F.3d at 948-49.

16        Second, while there is a reversion to Defendants, there is no reversion of attorneys' fees,

17   which is what the court *In re Bluetooth* warned against. 654 F.3d at 947. Instead, any portion of the

18   requested attorneys' fees that is not awarded by the Court will remain in the Settlement Fund to pay

19   for Class member claims, and the other costs of the settlement. (Settlement Agreement § VI.C.)

20   Thus, these funds will only revert back to the Defendants to the extent there are any Remaining

21   Funds after all such payments have been made.

22        Third, while there is a "clear sailing" fee provision in the Agreement, the Parties negotiated

23   the proposed Fee Award solely as a percentage of the overall value of the settlement—and only after

24   relief to the Settlement Class had already been agreed upon—inextricably linking Class Counsel's

25   fees to the value obtained for the Class. (Balabanian Decl. ¶ 7.) Accordingly, such a provision

26

27   ---

    [12]     Plaintiffs' request for the Fee Award does not, however, take into account the value of the

28   prospective measures and modifications to Defendants' Software Products under the Settlement, even though such benefits assuredly provide significant value to the Settlement Class.

should not cause concern, as the Ninth Circuit has only cautioned against approval in settlements where the requested fee is decided *independently* of the amount provided to the class, which is not the case here. *See In re Bluetooth*, 654 F.3d at 947.

Finally and most importantly, there was no collusion in this case. The Court can look to the assurances of counsel and the presence of a neutral mediator in this regard, all of which "weigh[] in favor of a finding of non-collusiveness." *In re Bluetooth*, 654 F.3d at 948. As explained above, despite keeping the lines of communication open and considering a potential early resolution of this matter, the instant settlement was reached only after nearly a year of litigation and discovery in two separate actions, additional informal exchanges of information and several in-person meetings and back-and-forths between counsel. (*See* Balabanian Decl. ¶¶ 3-8.) And even then, it took the assistance of third-party neutral, Mr. Wulff, to pull the Parties across the finish line during an all-day mediation session. (*Id.* ¶ 8.) Given the circumstances, coupled with the substantive terms of the settlement, there should be no question that collusion is not a concern here. *See In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011).

Thus, the final factor is satisfied and the Court can properly enter an Order granting final approval of the settlement.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order (i) granting final approval of their proposed settlement, (ii) dismissing Plaintiffs' Second Amended Complaint with prejudice and releasing Defendants of any and all liability as provided in the settlement Agreement, and (iii) granting such other and further relief as the Court deems reasonable and just.

Respectfully Submitted,

**JAMES LAGARDE** and **TIM BATCHELOR**, individually and on behalf of all others similarly situated,

Dated: February 21, 2013          By:  /s/ Rafey S. Balabanian
                                          One of Plaintiffs' Attorneys

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (*Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (*Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (*Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370

SEAN P. REIS (SBN 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, hereby certify that on February 21, 2013, I caused the above and foregoing *Plaintiffs' Motion for and Memorandum in Support of Final Approval of Class Action Settlement*, to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 21st day of February 2013.

/s/ Rafey S. Balabanian