IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LAGARDE, et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>SUPPORT.COM, INC., et al.,<br><br>　　　　　Defendants. | Case No.: C12-0609 JSC<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND COLLECTIVE INCENTIVE AWARD** |

In this pre-certification class action dispute, Plaintiffs allege Defendants induced the purchase of two computer performance products through misrepresentations about the status of potential customers' computers and the products' utility. Now pending before the Court are Plaintiffs' motion for final approval of a class action settlement (Dkt. No. 53), and Plaintiffs' unopposed motion for attorneys' fees and collective incentive award (Dkt. No. 51). Oral argument on the motions was held on March 21, 2013.

**BACKGROUND**

On February 7, 2012, Plaintiff James LaGarde initiated this action against Defendants after purchasing Defendants' Advanced Registry Optimizer ("ARO") software. Plaintiff Tim Batchelor, who purchased AOL Computer Checkup ("Checkup") software, joined the case on August 6, 2012 through the Second Amended Complaint. Batchelor initially brought suit in the Southern District of

New York (No. 1:12-cv-00963-JSR) "against AOL and a now dissolved subsidiary of Support.com related to the alleged deceptive design and marketing of the Computer Checkup software" but voluntarily dismissed that pending action because "a great deal of the evidence relevant to his claims was in [Defendants'] possession in San Francisco." (Dkt. No. 53 at 4-5.)

Plaintiffs bring three causes of action against Defendants in the Second Amended Complaint: 1) fraudulent inducement, 2) breach of express warranties, and 3) breach of contract. (Dkt. No. 39 ¶¶ 51-65.) Plaintiffs allege that Defendants' inaccurate statements about the ability of ARO and Checkup to enhance the speed, performance, and stability of personal computers induced customers to purchase these products at a price inflated by Defendants' false claims of value. (*Id.* ¶¶ 1-2, 5.) According to Plaintiffs, Defendants 1) provided potential customers with a free diagnostic scan designed "to misrepresent and exaggerate the existence and severity of detected errors, as well as the overall status of the PC" and 2) misled all customers, even those who did not use the free scan prior to purchase, about the services actually provided by ARO and Checkup. (*Id.* ¶¶ 1-5.) Some customers, including Plaintiffs, purchased ARO for approximately $29 or paid approximately $4.99 per month for a subscription to Checkup based on misrepresentations about "the purported low health and security status of their computer." (Dkt. No. 53 at 3-4.)

## SETTLEMENT PROPOSAL

On June 18, 2012, the parties met for a private mediation session with experienced neutral Randall Wulff, which resulted in an agreement in principle as to the primary terms of a class wide settlement. On November 2, 2012, the Court conditionally approved the class and preliminarily approved the settlement. The settlement class conditionally approved comprises: "All individuals and entities in the United States and its territories that have paid monies for any version of Defendants' Advanced Registry Optimizer and/or Computer Checkup software at any time until the date of this Preliminary Approval Order." (*Id.* at 3.) There are approximately 759,000 class members.

The settlement as it existed prior to the final approval hearing provides for 1) improvements to ARO and Checkup and their representations of functionality; 2) monetary relief for class members through a non-segregated $8,595,000 settlement fund to pay claims to class members

in the amount of $10 each, notice and administration expenses up to $100,000, a $5,000 collective incentive award to LaGarde and Batchelor, and attorneys' fees and reimbursement expenses up to $900,000 for this action and the previous Batchelor matter; and 3) three months of free access to Defendants' anti-spyware software valued at $7.50 for each class member.  The parties also agreed that half of the refunds Defendants have paid to purchasers of ARO and Checkup prior to the Claims Deadline will be applied against the Settlement Fund.[1]

With respect to the injunctive relief, Support.com has agreed to modify the source code of its ARO software to:

> (i) create a clear visual distinction between the "Junk Status" and "Security Status" reporting functions within the main Graphical User Interface ("GUI") displayed to users following the performance of a diagnostic scan, so that it is apparent that such reports correspond with the detection of distinct error types, and (ii) include active links within the software's GUI that, upon clicking, redirect the user to a display screen (or website) containing documentation that clearly explains the detection and reporting methodologies underlying the operations of ARO's diagnostic scan.

(Dkt. No. 53 at 7.)  Defendants have also agreed to modify Checkup's source code to "include active links within the software's GUI that, upon clicking, redirect the user to a display screen (or website) that contains documentation clearly explaining the detection and reporting methodologies underlying the operations of Computer Checkup's diagnostic scan." (*Id.*)

In addition, Defendants will create documentation for both products that explains, "in a clear and concise manner," the meaning of key terms generated by the products upon completion of a diagnostic scan. (*Id.*)  Further, the documentation shall describe, "in layman's terms, the actual risk to [consumers'] computers posed by the errors and other problems detected by the software that informed such reports." (*Id.*)

Support.com will take the above actions as soon as practicable, but in no event later than 14 days after effective date of the settlement. (*See* Dkt. No. 53, Ex. 1 § VI.)  The parties have also included an addendum to the settlement that provides an enforcement mechanism for the injunctive

---

[1] In granting preliminary approval, the Court found that the refund amount is minimal given that the class size is approximately 759,000 and, as of October 19, 2012, Defendants had paid $245,000 in refunds, $122,500 of which would be deducted from the $8,595,000 settlement fund. (Dkt. No. 50 at 12-13.) The remaining funds are more than sufficient to fully satisfy each claim made.

relief; namely, that "any non-breaching party shall be entitled to bring an action seeking to enforce" and can recover attorneys' fees if successful. (Dkt. No. 53, Ex. 1, Addendum at § III.K.)

## RESPONSE TO CLASS NOTICE

Notice to the class was delivered via e-mail, reaching more than 92% of the 759,000 class members' email addresses. (Dkt. No. 53 at 10.) No class member has objected to the settlement, and only three class members have sought exclusion. (*Id.* at 19.) However, a mere 1,259 timely claims were submitted for the $10 refund, which represents 0.17% of the total number of class members and 0.18% of the total number of class members who received notice. (Dkt. No. 56, Ex. 2.)

## MODIFICATION OF SETTLEMENT TERMS

At the hearing on Plaintiffs' motions, and in response to concerns expressed by the Court in light of the anemic claim rate, Plaintiffs offered, and Defendants did not oppose, that $200,000 would be deducted from the attorney's fee request and directed to a yet-to-be-named *cy pres* account. The Court also suggested that the settlement should be modified such that those class members who made claims would now receive $25 each, rather than $10. Plaintiffs agreed to the modification and Defendants did not oppose it. This additional $18,885 in class awards would also be deducted from the uncontested fee request.

## DISCUSSION

**A.   Approval of the Settlement Agreement**

As a preliminary matter, the Court notes that it previously certified a Rule 23(b)(3) class. (*See* Dkt. No. 50.) Thus, the Court need not analyze whether the requirements for certification have been met and focuses instead on whether the proposed settlement is fair, adequate, and reasonable, as required by Federal Rule of Civil Procedure 23(e)(2).

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a court typically considers the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7)

the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)) (hereinafter, "the *Churchill* factors).

However, when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone is" insufficient. *Id*. (emphasis original). In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties. *Id.* at 947. Because collusion "may not always be evident on the face of a settlement, . . . [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* In *Bluetooth*, the court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement); and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.*

    **1.**    **The *Churchill* Factors**
        **a.**    **The Strength of the Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation**

In determining the settlement's fairness, the Court must balance against the risks of continued litigation, including the strengths and weaknesses of Plaintiffs' case, the benefits afforded to class members, and the immediacy and certainty of a recovery. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Shames v. Hertz Corp.*, 2012 WL 5392159, at *5 (S.D. Cal. Nov. 5, 2012). Regarding the probability of Plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965

1 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Id*.

Here, as in many cases, there was a significant risk that this litigation would result in a lesser recovery for the class, or no recovery at all. Defendants challenged all of Plaintiffs' claims, asserting that the existence and applicability of additional contractual terms between the parties, reduced or eliminated Defendants' liability. (*See* Dkt. No. 53 at 13; *see also* Dkt. Nos. 20, 25.) In addition, Plaintiffs' and the class' recoveries would have ultimately turned on the resolution of several complicated factual issues regarding the underlying technical design and functionality of the software products, "which itself would have been extremely costly, time consuming, and involved the hiring of additional experts, taking of additional written discovery, and numerous depositions." (Dkt. No. 53 at 13.) Further, Plaintiffs concede that the software products provided some utility to class members, therefore Plaintiffs were not in a strong position in terms of isolating the particular harm to class members and quantifying their damages.

In light of the risks and costs of continued litigation, the immediate rewards to class members are preferable. Specifically, class members were offered a $10 cash payment and antispyware software worth $7.50 as compensation for paying $5-$30 for software that, based on Plaintiffs' allegations, arguably provided some utility, though not as fully as advertised. Under the proposed modifications to the settlement, those class members who made a claim will now receive a $25 cash payment, rather than $10. Admittedly, this increased award is available only to a fraction of the class—the 1,259 members who made claims—but for those class members who decided to receive the benefits offered, the monetary increase is relatively significant and represents nearly a full recovery for those class members. Indeed, for the likely small group of class members who made claims and whose damages totaled only $5, the $25 cash payment represents a windfall.

The injunctive relief offered in the settlement is also significant. Defendants have agreed to modify the source code of their software products to (i) create clear visual distinctions between the reporting functions within the main GUI displayed to users following the performance of a diagnostic scan, so that it is apparent that such reports correspond with the detection of distinct error types, and (ii) include active links within the products' GUI that, upon clicking, redirect the user to a display screen containing documentation that clearly explains the detection and reporting methodologies underlying the operations of their diagnostic scans. Defendants have further agreed that the documentation will, in a clear and concise manner, disclose the meaning of the status reports displayed to users upon completion of a diagnostic scan and describe, in layman's terms, the actual risks to their computers posed by the errors and other problems detected by the software.

The Court accordingly finds that the strength of Plaintiffs' case and the risk of continued litigation weigh in favor of approving the settlement.

### b. The Risk of Maintaining Class Action Status Throughout Trial

The third factor, which concerns the risk of maintaining class certification, favors settlement as well. Although Plaintiffs are confident that certification is proper for this class, Defendants, if given the opportunity to contest certification, would likely raise several meritorious arguments regarding individual issues that could defeat certification. For example, those class members who used the diagnostic scan prior to purchase versus those who did not; those who subscribed monthly to Checkup versus those who paid a fixed sum for ARO; those who interacted with the products heavily versus those who were passive consumers with less reliance on the products' assessments; and those whose computer's condition may have affected the software's functionality.

### c. The Amount Offered in Settlement

The fourth fairness factor, the amount of recovery offered, also favors final approval of the settlement. The settlement agreement was proposed after arms-length and adversarial negotiation, assisted by an experienced impartial mediator who helped the parties arrive at a compromise amount that satisfies both parties. In particular, class members were entitled to receive a $10 cash payment for each software purchase from an $8.595 million settlement fund. Further, each class member is

entitled to antispyware software worth $7.50 regardless of whether the class member submitted a claim, representing $5.6 million in in-kind benefits.

While the cash payments to class members could have exceeded $10, "that the settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). With most class members paying $5-$30 for software that, based on Plaintiffs' allegations, arguably provided some utility, though not as fully as advertised, $10 represents a fair and adequate compromise for the class members' claims. Notably, as discussed above, those class members who made claims will see their payment rise from $10 to $25, which increases Defendants' actual cash payout to the class to $31,475.

On the other hand, the claim rate for the $10 payment is slightly below 0.2%. This obviously low figure suggests that most class members considered the monetary relief obtained by Plaintiffs to not be meaningful. In addition, while Plaintiffs posit that $5.6 million in in-kind benefits is available to class members, it is unknown as to how many class members will actually take advantage of the three months of free software.[2] Nevertheless, the Court concludes that these deficiencies do not weigh against a finding of fairness and adequacy since the settlement amount is commensurate with the strength of the class' claims and their likelihood of success absent the settlement. *See In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) (finding settlement fair and adequate despite a claim rate between 0.16% and 0.28% for a $15 cash payment, and despite a likely $75 million overestimation of in-kind benefit payments); *see also Shames*, 2012 WL 5392159 at *8 (rejecting objections to fairness on the grounds that a $2 cash payment was *de minimus* since objectors failed to recognize that the damages each class member suffered—$3— "were themselves very small"). Moreover, "the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness." *Hanlon*, 150 F.3d at 1027. Indeed, of the 698,280 class members

---

[2] At the hearing, the parties informed the Court that the offer for the free software had yet to be sent to class members.

who received notice of the settlement, no objector has stepped forward to contest the amount offered and only three opted out of the settlement.

The recently added *cy pres* component also has the potential to contribute considerable value to the settlement. Although the Court cannot analyze the complete settlement package until the parties inform the Court of their proposed recipients for the $200,000 *cy pres* account,[3] the Court does find that a *cy pres* component is appropriate in this case. The *cy pres* doctrine "allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the next best class of beneficiaries." *Nachshin*, 663 F.3d at 1036 (internal quotation marks omitted). While the $200,000 offered is coming out of Plaintiffs' attorney's fee request, the amount can, for practical reasons, be considered an "unclaimed" portion of the settlement fund. The settlement is structured such that any unawarded attorney's fees revert back into the $8.595 million fund. Since Plaintiffs offered to reduce their fee request by $200,000, that $200,000 would be added to the unclaimed settlement funds. In addition, the Court finds it likely that if the $200,000 were offered directly to class members, the claim rate would not materially differ and the money would be unclaimed. This is because $200,000 spread out among 698,280 class members would result in an increased cash payment of approximately only $3.50. If a class member did not find $10 meaningful, it is unlikely that $13.50 would persuade him or her otherwise. *See Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *4 (N.D. Cal. Feb. 6, 2012) (finding that *cy pres* account created after claim period constituted "unclaimed" funds, as a practical matter, because if the account were distributed to the class, the additional payment would not be large enough to convince the vast majority of class members to make a claim).

### d. Extent of Discovery Completed

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the

---

[3] At that time, the Court will be able to make a finding as to whether the *cy pres* distribution "accounts for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).

9

bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Although the parties have not engaged in formal discovery in this action, in the related *Batchelor* matter, Batchelor served and AOL responded to written discovery requests, including interrogatories and production requests. (Dkt. No. 53 at 4-5.) After filing this case, the parties held an initial in-person meeting during which Plaintiffs presented their expert's conclusions regarding the software products and their underlying methodologies. (*Id.* at 5.) Finally, the parties did engage in some motion practice that, while limited, provided the parties with a better understanding of the information available to the opposing side. The Court accordingly finds that the extent of discovery in this case favors approval of the settlement.

### e. The Experience and Views of Counsel

The experience and views of counsel also weighs in favor of approving the settlement. Counsel for Defendants and proposed class counsel, both of whom have substantial experience in prosecuting and negotiating the settlement of class action litigation, concur that the settlement is fair. *See Rodriguez*, 563 F.3d at 967 ("[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation[.]") (internal quotation marks omitted). In addition, Plaintiffs' counsel has in the past and is currently prosecuting numerous class actions related to the alleged fraudulent design and marketing of so-called utility software. (*See* Dkt. No. 53, Ex. 2 ¶ 14.) In the context of that experience, Plaintiffs' counsel asserts that the settlement here "is an exceptional result." (*Id.* at ¶ 15.)

### f. The Presence of a Government Participant

Although no governmental entity is a party to this action, the United States Attorney General, as well the Attorneys General for each state, were notified of the settlement pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. (*See* Dkt. No. 53, Ex. 3 ¶ 4.) "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner*, 2010 WL 1687832 at *14. To date, no state or federal official has raised any objection or concern regarding the settlement.

10

**g.     The Reaction of the Class Members to the Proposed Settlement**

As already noted, the reaction of the class to the proposed settlement supports a finding of fairness. Although very few class members filed claims, only three out of the 698,280 class members who received notice of the settlement have opted-out, and no objection has been made. "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Garner*, 2010 WL 1687832 at *14 (internal quotation marks omitted). Thus, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Id.* (internal quotation marks omitted).

**2.     The *Bluetooth* Factors**

Given that this settlement was reached prior to class certification, the Court must look beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The Court finds no evidence of explicit collusion, but the three warning signs identified by the Ninth Circuit are arguably present here. Even if those warning signs exist, however, the Court finds no evidence of collusion among the parties. *Id.* at 950 (noting that upon remand the district court may uphold the settlement notwithstanding the presence of all three warning signs).

First, the Court compares the payout to the class (actual and expected) to the unopposed claim of fees by class counsel. *See Harris v. Vector Mktg. Corp.*, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). Prior to the hearing, Plaintiffs contended that they are not receiving a disproportionate distribution of the settlement because the proposed fee award—$900,000— "amounts to just 9.95% of the Settlement Fund and just over 6% of the total cash and in-kind benefits combined." (Dkt. No. 53 at 20.) Plaintiffs asserted that these are reasonable percentages given that the Ninth Circuit's benchmark is 25% in common fund cases. With Plaintiffs' voluntary deduction of $218,885, Plaintiffs' new request is $681,115, which is 7.9% of the settlement fund. However, the Court is not persuaded that the attorney's fees should be measured against the full

11

settlement fund, as opposed to the actual payout from that fund, for purposes of the collusion analysis. As the court in *Harris* explained,

> [While] the Court is cognizant of the fact that the Ninth Circuit has held that in awarding attorneys fees in a class action, the percentage benchmark must be measured against the full fund established by the settlement and not actual payout to the class[,] . . . the determination of what is a reasonable fee presents a question different from whether, under *Bluetooth*, the overall settlement is fair, reasonable, and adequate. Indeed, because attorney's fees under current Ninth Circuit law may be based on the size of the fund theoretically available rather than an actual amount claimed and paid to the class, there is an inherent risk of a conflict of interest between counsel and the class, a risk far more extant than if fees were based instead on actual class recovery. It is in this context that scrutiny under *Bluetooth* is particularly warranted.

*Harris*, 2011 WL 4831157 at *6. Here, the actual payout to the class—with the increase to $25 for made claims and the $200,000 *cy pres* account—is approximately $231,475.[4] Plaintiffs' new negotiated fee award represents 75% of the total amount of the settlement, which is disproportionate though not as disproportionate as in *Bluetooth*. *See Bluetooth*, 654 F.3d at 947 (finding $800,000 attorney's fee agreement disproportionate to zero dollars in monetary class recovery). Further, Plaintiffs' requested fee award is almost three times the actual payout to the class.[5] *See Harris*, 2011 WL 4831157 at *6 (finding fee award four times the actual and expected payout to the class to be problematic).

In addition, Plaintiffs acknowledge that the second warning sign—a "clear sailing" provision[6]—is included in the settlement. "The very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted). "Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and

---

[4] Although Defendants have offered $7.50 in in-kind benefits, this offer is not yet available to class members, thus it is not possible to determine how many class members will actually take advantage of the free software.

[5] Without the recent increase in the amount awarded to the class, the negotiated fee award would be 98.6% of the total amount of the settlement and would be 71 times the actual payout to the class.

[6] This provision is an agreement between the parties whereby Defendants will not object to Plaintiffs' request for fees up to $900,000.

12

scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id*.

Although Plaintiffs concede the existence of a clear sailing provision, they argue that it is not the kind of clear sailing provision that worried the court in *Bluetooth* because the requested fee was decided after the class fund was established and was based on a percentage of that fund. (*See* Dkt. No. 53 at 21 ("[T]he Ninth Circuit has only cautioned against approval in settlements where the requested fee is decided *independently* of the amount provided to the class.").) Plaintiffs, however, misread *Bluetooth*. Nothing in that case suggests that a clear sailing provision may be ignored where the fee award is determined based on a percentage of the settlement fund; rather, the *Bluetooth* court cautioned that district courts should not dismiss a clear sailing provision "simply because approval of the award was not dependent on the approval of fees." *Bluetooth*, 654 F.3d at 948. In other words, it does not matter that approval of the fee award is independent of the approval of the settlement. The court did not find that a clear sailing provision may be forgiven where the fee award calculation is dependent on the value of the settlement fund. Indeed, as noted above, collusion concerns are particularly present where a fee award is negotiated as a percentage of the settlement fund.

Finally, the third warning sign—when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund—is effectively present in this case. In *Harris*, the settlement agreement provided that unawarded attorney's fees would revert back to the settlement fund. 2011 WL 4831157 at *7. However, the court found that the settlement agreement contained, "in essence," a reverter provision comparable to that identified as problematic by the Ninth Circuit in *Bluetooth* because it was obvious to the parties that unawarded attorney's fees would revert back to the defendant, along with the bulk of the unclaimed settlement fund. *Id.* The same is true here. Although the parties did not appear to expect a claim rate as low as it is, the parties certainly believed that only a fraction of the settlement fund would actually be paid out. (*See* Dkt. No. 46 at 13 (Plaintiffs noting at oral argument on their motion for preliminary approval that the response rate could be as low as 2% or as high as 30%).) Because the parties were well aware that it was not

13

realistic to expect unawarded fees to be distributed to the class—even if the claim rate reached its highest predicted level—the Court finds that the settlement contains a reverter provision.

Notwithstanding the existence of all three warning signs, the Court finds that the settlement did not result from, nor is influenced by, collusion. While the requested attorney's fees are disproportionate to the actual payment to class members, as already discussed, the $10 offered to each class member fairly and adequately satisfies their claims. That most class members presumably found it not worth their time to file the claim form and receive a $10 check, does not impute collusion to the parties. Further, the parties have now offered for $218,885 to be added to the amount actually distributed to the class, albeit $200,000 of that amount will be going towards a *cy pres* account.

Further, the most significant relief here is not the direct monetary payment to class members, but the injunctive relief Defendants have agreed to institute. This injunctive relief provides real changes to Defendants' software that address the deceptive marketing allegations at the heart of Plaintiffs' claims. While Plaintiffs may have been unable to negotiate a higher cash payment to class members—because their damages did not support a higher payment—Plaintiffs were able to obtain significant prospective relief, which supplements a fair cash payment, $7.50 in in-kind benefits, and the *cy pres* account. [7] Therefore, despite the existence of the disproportionate fee award to the monetary benefit to the class, the Court finds that nothing suggests that Defendants "obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained." *Bluetooth*, 654 F.3d at 947.

For the same reasons, the Court finds that Plaintiffs did not bargain away benefits to the class that it otherwise would have obtained when they secured the clear sailing provision and allowed the unawarded fees to effectively revert to Defendants. Had Plaintiffs colluded with Defendants to reduce class relief in exchange for higher fees, the settlement would not provide such a substantial value—in recovery of damages, injunctive relief, *cy pres* distribution, and in-kind benefits—to the

---

[7] The Court is satisfied that enforcement of Defendants' injunctive relief obligations, if needed, will occur in light of the agreement that attorney's fees are available for a non-breaching party's enforcement of the settlement's terms. (*See* Dkt. No. 53, Ex. 1, Addendum at § III.K.)

14

1  class.  In addition, the Court specifically finds that the reverter provision here does not contravene
2  the court's warning in *Bluetooth*.  The court noted that if a defendant is willing to pay a sum certain
3  for attorney's fees, but those fees are unreasonable, "there is no apparent reason the class should not
4  benefit from the excess allotted for fees," rather than have the fees revert to the defendant.
5  *Bluetooth*, 654 F.3d at 949.  Here, however, the "kicker provision is in the class' best interest as part
6  of the settlement package," *id.*, because Defendants have already provided fair and adequate
7  monetary and non-monetary relief to class members that almost fully remedies their damages.
8  Moreover, Plaintiffs' offer to reduce their fee request by $218,885 and assign that money to a *cy*
9  *pres* account and additional cash payments to class members who made claims undercuts the reverter
10 provision's danger.  As noted at the hearing, the Court is reluctant to award $900,000 in attorney's
11 fees in this case.  That a significant portion of this request is now going to the class—as opposed to
12 Defendants—lessens the concern that would otherwise be present if Plaintiffs' fee request remained
13 unchanged.
14 　　　　Finally, although the parties reached resolution of their dispute relatively quickly,[8] the parties
15 did so through the use of an experienced neutral mediator—Randall Wulff—thus favoring a finding
16 of non-collusion.  *See Bluetooth*, 654 F.3d at 948 (holding that participation of mediator is not
17 dispositive, but is "a factor weighing in favor of a finding of non-collusiveness").

18 **B.     Attorney's Fee Award**

19 　　　　"While attorneys' fees and costs may be awarded in a certified class action where so
20 authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent
21 obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have
22 already agreed to an amount."  *Bluetooth*, 654 F.3d at 941.  Where a settlement produces a common
23 fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or
24 the percentage-of-recovery method.  *See In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th
25 Cir. 2010).  "Because the benefit to the class is easily quantified in common-fund settlements, we
26 have allowed courts to award attorneys a percentage of the common fund in lieu of the often more

---

[8] This action and the *Batchelor* matter were both filed on February 7, 2012; the parties met with the neutral mediator on June 18, 2012, where they agreed in principle to the settlement.  (*See* Dkt. No. 53, Ex. 2 ¶¶ 6-7.)

15

time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942 (noting that 25% of the fund is considered the "benchmark" for a reasonable fee). "Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result. Thus, for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *Id.* (citations omitted).

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id.* at 941. The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. *Hanlon*, 150 F.3d at 1029. The Ninth Circuit recommends that whatever method is used, the district court perform a cross-check using the second method to confirm the reasonableness of the fee, e.g., if the lodestar method is applied, a cross-check with the percentage-of-recovery method will reveal if the lodestar amount surpasses the 25% benchmark. *See Bluetooth*, 654 F.3d at 944-45.

Following oral argument, Plaintiffs now seek $681,115 in fees,[9] which amounts to 7.9% of the $8.595 million settlement fund and 4.8% of the total cash and in-kind benefits combined. (Dkt. No. 51 at 1-2.) Plaintiffs' lodestar figure is $480,649.50, representing 1,239.1 hours of work among seven attorneys and various law clerks. (Dkt. No. 51, Ex. 1 ¶ 18.) Plaintiffs assert that a multiplier is reasonable, given the results achieved, to enhance the fee award above $480,649.50. (*See* Dkt. No. 51 at 2.)

Although Plaintiffs argue that the percentage-of-recovery method should be applied, the Court instead applies the lodestar method. As already discussed, the primary relief here is injunctive—the claim rate is below 0.2%, meaning Defendants will only make cash payments of $31,475 even with the increased claim amount, and Plaintiffs have provided no information regarding the claim rate for the in-kind benefit. *See Bluetooth*, 654 F.3d at 941 (noting that the

---

[9] Plaintiffs also seek $20,361.03 in costs.

16

lodestar method is appropriate "where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized"). The common fund Plaintiffs identify is largely illusory; only a fraction of the $8.595 million set aside for cash payments will actually be obtained by the class or even paid by Defendants.

Application of the lodestar method is particularly desirable in situations where, as here, the tangible benefits offered to the class have not reached the vast majority of class members. In rejecting a class counsel's request to award fees based on the maximum dollar value defendant *could* have paid to class members, a court in this District has aptly noted that

> [t]o award class counsel the same fee regardless of the claim participation rate, that is, regardless of the enthusiasm of the class for the benefits purportedly negotiated on their behalf, would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the needs of the class. . . . If the Court takes [the ineffectiveness in fashioning relief] into account in setting the fee, in future litigation class case counsel will design a settlement that actually reaches consumers, perhaps through a different mode of communication. If the Court ignores the settlement's effectiveness, as class counsel urges, there is little incentive to design an effective settlement since they will receive the same fee regardless. Common sense dictates that a reasonable fee in a class action settlement is a fee that takes into account the actual results obtained.

*Yeagley v. Wells Fargo & Co.*, 2008 WL 171083, at *9 (N.D. Cal. Jan. 18, 2008), *rev'd on other grounds*, 365 Fed. Appx. 886 (9th Cir. Feb. 22, 2010); *see also In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 401-08 (D. Mass. 2008) (discussing the issues associated with awarding class counsel fees based on a common fund only a fraction of which is actually paid out). If Plaintiffs' counsel wishes to be rewarded for the full potential value it creates, then it must design better and more creative means to allow class members to access that value. The Court does not subscribe to the belief that these types of consumer class actions are destined to always produce woefully low claim rates. Given our world's seemingly ever-expanding communication and payment delivery systems, it is particularly appropriate to incentivize class counsel in future litigation to test the abilities and effectiveness of these systems in the class action context. The Court concludes that applying the lodestar method in this case is preferable to the percentage-of-recovery method in ensuring that the fee takes into account the actual results obtained.

17

Turning to the lodestar calculation, the Court finds that the hourly rates for the seven attorneys who billed time on this case and the *Batchelor* matter are reasonable given the geographic location and experience of counsel. Upon review of the billing records, the Court finds that the total time and fees incurred by Plaintiffs' counsel were reasonable in light of the work undertaken and the results achieved. While a not insignificant portion of the billing entries appear to be generously computed, the Court takes into account that counsel has continued working on this case since filing the fee request on January 15. Accordingly, Plaintiffs' $480,649.50 lodestar amount will be adopted.

Plaintiffs, however, seek to increase the lodestar to $681,115, which amounts to a 1.4 multiplier. The Court is satisfied that application of a multiplier is warranted under the circumstances here. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300-01 (9th Cir. 1994) (noting that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases" and finding district court's failure to apply multiplier to lodestar calculation was abuse of discretion where case was "fraught with risk and recovery was far from certain"). Because Plaintiffs' counsel's hourly rates are the normal rates they charge in non-contingent cases, (*see* Dkt. No. 51, Ex. 1 ¶ 20), without a multiplier the risk Plaintiffs' counsel took in bringing this contingent-fee case would not be accounted for. The Court finds that a multiplier of 1.4 is reasonable in this case.

Regarding costs, the Court finds that certain travel expenses are unreasonable. Specifically, Plaintiffs' counsel seeks reimbursement of three flights between, presumably, Chicago and San Francisco, that each exceed $1,000, with one flight costing $1,847.60. There is no reason offered, and the Court can envision none, that would justify such expensive plane tickets in this case. Indeed, several other flights for which Plaintiffs' counsel seeks reimbursement average approximately $500—a considerably more reasonable figure. The Court accordingly deducts $2,000 from Plaintiffs' request for costs.[10]

---

[10] This figure is calculated by subtracting from the total amount of unreasonable travel expenses ($4,371) an amount that approximates a reasonable cost for those flights (3 X $500 = $1,500). The Court is also aware that Plaintiffs' counsel has not billed for travel expenses incurred as a result of the hearing on the present motions, and thus deducts only $2,000 rather than $2,871.

18

### C. Incentive Award

Finally, Plaintiffs ask to be compensated $2,500 each as an incentive payment. "Incentive *awards* [as opposed to agreements] are fairly typical in class action cases." *Rodriguez*, 563 F.3d at 958. There is no evidence that named Plaintiffs and counsel agreed prior to the suit to a particular incentive agreement. Though viewed more favorably than incentive agreements, "excess incentive awards may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted). Incentive awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id*. at 958-59.

A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008); *Lemus v. H & R Block Enters. LLC.*, 2012 WL 3638550 *6 (N.D. Cal. Aug. 22, 2012) (finding incentive payments to the named plaintiffs proper after receipt of declarations from the named plaintiffs outlining their involvement in the litigation justifying their awards, including the amount of hours they dedicated to the case).

Plaintiffs do not provide their own declarations justifying their incentive payments; rather, their counsel provides a declaration in which he states that

> Plaintiffs assisted Class Counsel with the investigation of their claims and provided Counsel with valuable information relating to their purchase, use, and experiences with Defendants' Software Products. Further, Plaintiffs also consulted with Class Counsel on multiple occasions over the phone and by email (including throughout the all-day mediation), and reviewed numerous pages of documents, including filings, written discovery, and Settlement papers.

(Dkt. No. 51, Ex. 1 ¶ 26.) The $2,500 incentive payment appears excessive in light of the lack of specific information in the declaration regarding the amount of time Plaintiffs actually spent

accomplishing the various listed tasks. Motion practice and discovery were limited in this case; Plaintiffs were not deposed nor appeared in person at the one-day mediation. Given the vague description of Plaintiffs' tasks in the declaration and the apparently little need for Plaintiffs' involvement in this case, the Court finds that a $1,000 incentive award to each named plaintiff is appropriate.

## CONCLUSION

Because the parties have yet to designate the recipients of the proposed *cy pres* account, the Court cannot yet make a final determination as to the settlement's fairness, adequacy, and reasonableness. For the same reason, the Court cannot at this time grant Plaintiffs' motion for attorney's fees, expenses, and incentive award. The parties shall meet and confer within 14 days of the date of this Order to discuss *cy pres* account recipients, and shall notify the Court in writing, within 30 days of the date of this Order, of the proposed recipients and why those recipients meet the applicable *cy pres* requirements.

**IT IS SO ORDERED.**

Dated: March 25, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE